No. 93-103

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

MONTANA RAIL LINK

    Petitioner/Respondent,

-v-

M. JANE BYARD and the MONTANA
HUMAN RIGHTS COMMISSION,

    Respondents/Appellants.

FILED

SEP 16 1993

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Edward P. McLean, Judge presiding.


COUNSEL OF RECORD:

    For Appellant:

        Edward A. Murphy, Datsopoulos, MacDonald & Lind,
Missoula, Montana

    For Respondents:

        David Rusoff, Human Rights Commission, Helena,
Montana: Joan Jonkel, Missoula, Montana


                Submitted on Briefs:  July 20, 1993

                       Decided:  September 16, 1993

Filed:

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

Before the Court is Petitioner's appeal from a Fourth Judicial District Court, Missoula County, order affirming the Montana Human Rights Commission determination that Montana Rail Link (MRL) discriminated against the Respondent M. Jane Byard (Byard) in violation of the Montana Human Rights Act, based on her sex. We affirm.

We restate the issues on appeal:

I. Did the hearing examiner err in allowing Byard to amend her complaint?

II. Did the hearing examiner err in allowing the testimony of Dr. Hocker?

III. Did the hearing examiner err in prohibiting the testimony of Ron Dean?

IV. Did the hearing examiner err in concluding that MRL subjected Byard to discriminatory treatment?

V. Did the hearing examiner err in concluding that MRL's hiring practices had a disparate impact on women?

BACKGROUND

Byard was hired by Burlington Northern Railroad (BN) in 1977. She received a promotion in November of 1978 when she became an engineer. Byard is currently employed as a BN engineer in Havre, Montana, although she is on a leave of absence. She initially worked in Missoula, Montana and maintained a residence there.

In July of 1987, BN reached an agreement with MRL to acquire a portion of the rail line called "Southline" which ran from

2

Huntley, Montana to Sandpoint, Idaho. William Brodsky was appointed president of the new line. It was Mr. Brodsky's responsibility to staff the new line with EN employees presently working on the Southline, if possible, because of their experience and familiarity with that section of track.

Mr. Brodsky also stated his intention to work out an agreement with the local unions who represented the BN employees. The two unions representing the BN employees were United Transportation Union (UTU) and the Brotherhood of Locomotive Engineers (BLE). MRL and the BLE reached an agreement in September of 1987, giving the Southline employees "preferential hiring in seniority order, as such seniority is stated on the current applicable Burlington Northern (BN) – seniority district rosters...." MRL did, however, reserve the right to seek employees from other sources if it could not reach the minimum operating requirements through the hiring of BN employees. In addition, it could reject BN employees who did not meet MRL's hiring standards.

The MRL management then scheduled a number of meetings across the Southline for the purpose of introducing potential employees to MRL, its goals and its philosophies. BN offered its employees the opportunity to stay with BN, working outside of the Southline track or apply to MRL to work on the Southline. BN assisted MRL in its attempt to hire Southline BN employees, even offering engineers who applied with MRL $25,000 if they accepted positions with MRL. MRL used town meetings, letters to BN Southline employees and word-of-mouth advertising to solicit employees.

3

As a BN Southline employee wishing to remain in the Missoula area, Byard attended a MRL informational meeting at the University of Montana in Missoula with her husband, Byron Weber (Weber). William Brodsky, and Ron Dean, a negotiator with the BLE, spoke at the meeting in an attempt to persuade EN employees to join MRL. Brodsky stressed the team approach which would characterize MRL, unlike traditional railroads. He also stated that BN employees would be given every opportunity to have their many questions about MRL answered by management.

After that meeting, EN employees received a letter and application from MRL. The letter stated that MRL representatives would be available at various locations at scheduled dates and times to "answer questions, accept application and conduct interviews." The letter encouraged the applicants to attend the meetings and bring their questions. If they could not attend the meetings, they should mail their applications to MRL.

Byard completed her application and submitted it for an engineer position, bringing the application to MRL's Missoula office accompanied by her husband. She assumed, due to Mr. Brodsky's presentation at the earlier meeting and letters from MRL representatives following the meeting, that the main purpose of the interview sessions was to provide prospective employees with the chance to ask questions about MRL and therefore brought her husband with her.

Byard met initially with George Harper (Harper), a consultant to MRL, who was ultimately hired as Assistant Superintendent of

Railroads for MRL. Byard had prepared questions about certain benefits she was interested in, including maternity leave, time-off and the physical examination clause. Byard asked Harper about maternity leave and as he searched for an answer, John Grewell (Grewell), Superintendent of Railroads and former supervisor of Byard, entered the room.

Grewell assumed control of the interview and when Byard asked Grewell about maternity leave, he stated, "I think they'd let you have some time off two weeks before you are supposed to deliver." No more was said about the maternity leave policy.

Byard asked about the time-off policy, wondering if she could only expect one "personal" day off per month. Grewell stated, "That's a hell of a lot more than you are getting right now."

Clause 29b of the application form stated that a MRL employee agrees "[t]o permit a physical examination of myself at such times and places and under the supervision of such doctor or doctors as may be selected by [MRL]." Byard was uncomfortable with this clause and stated her feeling that it was offensive to women. Grewell disagreed with her position and informed her that no one else had taken offense to the clause and everyone had signed the application up to that point. He stated that the clause concerned drug testing and physicals. Byard wondered why that was not made clear on the application. She asserted that under that wording "she could be subject to a physical examination by a math professor at Garrison at three o'clock in the morning." Ultimately, she signed her application but wrote on the application that "I do not

include my signature on 29b as it is presently worded."

Grewell produced another form for "Physical Examination and Alcohol and Drug Testing Authorization," stating that if she did not want to sign Clause 29b, then she would not want to sign this one either. However, this form was quite specific concerning blood and urine tests for the presence of alcohol and other drugs. Byard had no qualms about signing this form and signed it later at her home.

Grewell then took Byard's application and told her to complete the other forms and drop them off at the office. Weber dropped the forms off at MRL's Missoula office within a couple days of the interview. When Byard did not hear from MRL, she called the MRL office and she was told by a representative that he thought she had not signed her application. She cleared up that misunderstanding and was later told by the representative that her application had been denied, with no reason for the denial given. In April of 1988, Byard filed a complaint with the Human Rights Commission against MRL, contending that MRL would not hire her because of her sex.

Byard continued to work for BN as an engineer but had to move to Whitefish to work on a different line. She became pregnant and took an early maternity leave in March of 1988 and gave birth to a son in July of 1988. She returned to work at BN, moving to Havre in January of 1989, taking her son with her. Byard took a leave of absence from her position at BN shortly before her hearing before the Human Rights Commission (Commission) hearing examiner in April

6

of 1990.

The hearing took place on April 25 through April 27, 1990, and continued from May 14 through May 16, 1990. The hearing examiner issued her Findings of Fact, Conclusions of Law and Proposed Order in April of 1991. She concluded that MRL had unlawfully discriminated against Byard based on her sex, and awarded Byard damages. MRL filed exceptions to the proposed order and in September of 1991, oral argument was held before the Commission. The Commission filed its Findings of Fact, Conclusions of Law and Final Order dated October 2, 1991, affirming the hearing examiner's proposed Findings of Fact, Conclusions of Law and Proposed Order in substantial part.

MRL appealed the Commission's decision and after reviewing the briefs, oral argument and a review of the Human Rights Commission file, the District Court affirmed the Commission in an opinion dated December 17, 1992. The present appeal followed. Additional facts will be included as necessary.

## STANDARD OF REVIEW

The standard of review for conclusions of law is whether the agency's interpretation of the law is correct. Steer Inc. v. Department of Revenue (1990), 245 Mont. 470, 474, 803 P.2d 601, 603. The standard of abuse of discretion is applied to discretionary rulings, such as trial administration issues, post-trial motions and similar rulings. Steer, 803 P.2d at 603-604.

## I. AMENDMENT OF COMPLAINT

MRL contends that the original charge in Byard's complaint

alleged disparate treatment but in her proposed prehearing order, she alleged a disparate impact theory as well as a disparate treatment theory.. Byard counters that "[i]n April of 1990, two weeks prior to t.he beginning of the hearing, Byard submitted a PreHearing Memorandum. In her memorandum, Byard contended that MRL violated the Human Rights Act under two theories, disparate treatment (intentional discrimination) and disparate impact (application of a facially neutral practice or policy which has a disparate impact on members of a protected class). Byard's PreHearing Memorandum was incorporated into the hearing examiner's PreHearing Order,. signed by both parties, which expressly stated that it was intended to supersede the pleadings."

Section 24.9.323(5), ARM, states that "[a] complaint may be amended by way of a prehearing order which contains the contentions of the parties and which is substituted for pleadings in the contested case." Part XIV of the Final PreHearing Memorandum and Order states that.:

> The parties understand and agree that should this memorandum be accepted by the hearing examiner or accepted with changes and additions, it shall be deemed to be in substitution for any pleadings in this matter and treated as the standard of relevance and case to be submitted for hearing and decision.

The above memorandum was signed by both parties.

In addition,, Byard argued a disparate impact theory in her Brief In Support of Objections, filed in May of 1989. MRL's Brief In Opposition To Byard's Objections, also filed in May of 1989, also discussed disparate impact. These briefs were filed approximately one year before the Final PreHearing Memorandum and

8

Order.

Section 24.9.323(6), ARM, states that "[t]o the extent the amendment of pleadings is not otherwise addressed in this rule, such amendments shall be governed by the provisions of Rule 15 of the Montana Rules of Civil Procedure." Rule 15(a) provides in part: "[o]therwise, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." This Court has interpreted Rule 15(a) liberally, "allowing amendment of pleadings as the general rule and denying leave to amend as the exception." Hobble-Diamond Cattle v. Triangle Irr. (1991), 249 Mont. 322, 325, 815 P.2d 1153, 1155. In addition,

> Although leave to amend is properly denied when the amendment is futile or legally insufficient to support the requested relief, it is an abuse of discretion to deny leave to amend where it cannot be said that the pleader can develop no set of facts under its proposed amendment that would entitle the pleader to the relief sought.

Hobble, 815 P.2d at 1155-1156. In this case, a disparate impact theory had been previously argued and the hearing examiner concluded that the pleader could develop facts to support the disparate impact theory.

In conclusion, the pleadings were appropriately amended to include a disparate impact theory and the hearing examiner did not abuse her discretion in allowing the amendment.

## II. EXPERT TESTIMONY

Byard presented an expert in communications and clinical psychology, Dr. Hocker, who discussed interpersonal communication,

particularly communication styles and how they affect conversations between men and women in the work setting. She stated her impressions about: Byard's interview with Harper and Grewell, two managers of MRL, one of whom is the superintendent of the railroad and the other an assistant superintendent of railroads of MRL. Dr. Hocker read a number of materials to prepare for her testimony at the hearing. MRL states that an expert may base her opinion on facts or data perceived by or made known to her at the hearing or beforehand but it contends, however, that with the exception of the agreed statement of facts and Hocker's session with Byard, the expert's data and facts do not "measure up" to the standard provided for in Rule 703, M.R.Evid. Rule 703, M.R.Evid. provides:

> The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

> The Commission Comments to Rule 703 state that:

> This rule is identical to Federal and Uniform Rules (1974) Rule 702. It is concerned with the sources of information upon which an expert may rely in forming an opinion....

> * * * * * * * * *

> The second sentence of Rule 703 provides the third source of information and allows information which '...consists of presentation of data to the expert outside of court and other than by his own perception.' As the rule indicates, this source of information need not be admissible evidence if it meets the test of a type of fact or data reasonably relied on by experts in that particular field. The Advisory Committee's Note also indicates that this step was taken 'to broaden the bases for expert opinion beyond that current in many jurisdictions and to bring the judicial practice in line

10

with the practice of the experts themselves when not in court'.  (Citation omitted.)

In the present case, Dr. Hocker reviewed the parties' Agreed Statement of Facts, the parties' separate contentions, the Human Rights Investigator's file and briefs from both parties. In addition, she spoke with Byard regarding her feelings about the conversation which took place during her interview.  She read materials from both parties regarding their interpretations of the conversation, as well as a neutral investigator's report.  Common sense tells us that summaries of the conversation at issue, whether in the form of legal briefs or otherwise, would be used in the field of interpersonal communications for analysis of a conversation at issue  if the expert was not present at the interview.  Facts provided by both parties, as well as an impartial observer, would serve as the best available resources in interpreting the dialogue. Dr. Hocker was well qualified to discuss communication styles and gathered sufficient material from which to interpret the interview.

This Court also notes that the hearing examiner stated in her Findings of Fact, Conclusions of Law and Proposed Order regarding Dr. Hocker's testimony that:

> [h]ere the opinion assessed how Byard's interview was affected by differences in male and female communication styles and perceptions, essentially based on a summary of each party's version of the facts.  As the record developed, there was little, if any, variance between the testimony presented during the hearing and the contentions of fact and factual assertions submitted in the prehearing process regarding what occurred at Byard's interview.

MRL also objected to the fact that Dr. Hocker did not speak

11

with either of the men involved in the interview in which MRL decided not to offer Byard a contract. This precise question was discussed in Price Waterhouse v. Hopkins (1989), 490 U.S. 228, 109 S.Ct. 1775, 104 L. Ed. 2d 168, wherein the respondent's expert, Dr. Susan Fiske, a social psychologist, testified "that the partnership selection process at Price Waterhouse was likely influenced by sex stereotyping." Price Waterhouse, 490 U.S. at 235.

In Price Waterhouse, the respondent, Ann Hopkins, had been proposed as a candidate for partnership by partners in her local office. Her candidacy was held for reconsideration the following year, and when the local partners did not re-propose her candidacy the next year, she brought an action under Title VII of the Civil Rights Act.

Respondent'& expert testified that Hopkins' uniqueness (the sole woman up for partnership) and the subjectivity of the evaluations by the partners "made it likely that sharply critical remarks such as these were the product of sex stereotyping. . ." Price Waterhouse, 490 U.S. at 235-236. Dr. Fiske based her testimony on a review of the various comments made by partners during the selection process. She stated that "it was commonly accepted practice for social psychologists to reach this kind of conclusion without having met any of the people involved in the decisionmaking process." Price Waterhouse, 490 U.S. at 236.

In the present case, Dr. Hocker did not personally interview anyone from MRL. Like Dr. Fiske, however, she reviewed comments from the conversation using materials similar to those at issue in

12

Price Waterhouse.. She read the parties' interpretations of the interview and reviewed an agreed statement of facts and a neutral investigator's account of the interview. Dr. Hocker reviewed many more materials than those reviewed in Price Waterhouse and found to be acceptable by the United States Supreme Court. We conclude that Byard's expert based her testimony on a review of materials appropriate for such use and the hearing examiner did not abuse her discretion when she allowed Dr. 1-locker's testimony.

### III. RON DEAN'S TESTIMONY

MRL argues that Ron Dean's (Dean) testimony should have been allowed because he had relevant information, Byard was informed that MRL intended to call him as a witness and his testimony would not have been a surprise. Byard counters that Dean was correctly prevented from testifying because MRL violated discovery, particularly pertaining to Dean's testimony. Also, Dean's testimony at the hearing would have been in direct contrast to MRL's position taken in prehearing discovery and thus MRL was correctly estopped from presenting their theory at trial.

Interrogatories 27, 36 and 37 of Byard's first set of interrogatories, dated November 3, 1989, and sent to MRL pertained to possible testimony by Dean but no information was provided about his testimony in MRL's answer dated December 13, 1989. Interrogatories 61, 62 and 78 of Byard's second set of interrogatories, dated December 27, 1989, and sent to MRL also pertained to possible testimony by Dean but again, no information was provided about his testimony in MRL's answer dated February 2,

1990. Byard's third set of interrogatories was dated March 28, 1990, and requested supplements to the first and second sets of interrogatories. MRL's answer was dated April 24, 1990, but no additional information on Dean's testimony was provided in the answer. In addition to that request for supplementation to the first sets of interrogatories, Byard's counsel wrote letters to MRL's counsel requesting supplementation of the interrogatories.

The hearing examiner stated in her Findings of Fact, Conclusions of Law and Proposed Order, that "this examiner was troubled by the dribbling and spotty nature of MRL's responses to discovery. Generally speaking, MRL's responses were neither timely nor complete." She further discussed her concerns over Dean's proposed testimony at trial, reporting the following:

> On the fourth day of hearing, MRL called Ron Dean, Vice President and International Director of the Brotherhood of Locomotive Engineers, as a witness. Among other things he was asked whether he was aware that BN engineer Byard had not been hired by MRL, at which point counsel for Byard objected to such testimony on the ground that MRL failed to disclose Dean's knowledge of Byard's rejection in answers to interrogatories and requests for admissions.
> MRL contended that it had disclosed Ron Dean as a witness, and, even though it did not disclose the particulars of his testimony, Byard had ample opportunity to investigate his testimony and in fact, had contacted Dean regarding his testimony prior to hearing.
> Following argument and review of the discovery responses, the objection was sustained. The substance of Dean's testimony should have been disclosed either in MRL's responses to interrogatories numbered 29, 37, or 61 or, in its response to request for admission number 15, but was not.

We agree. Section 24.9.317(4), ARM, empowers a hearing examiner to limit the prosecution or defense of a contested case to proof of matters disclosed through discovery when a party does not

14

engage in full and complete discovery. Vainio v. Brookshire (1993), 50 St.Rep. 529, 531, ___ Mont. ___, 852 P.2d 596, 600. In the instant case, numerous attempts were made by Byard's counsel to obtain the substance of Dean's testimony with no results. "This Court has held that the imposition of sanctions for failure to comply with discovery is regarded with favor." Vainio, 852 P.2d at 600. (Citation omitted.)

When the hearing examiner limited Dean's testimony as to the failure to hire Byard, she provided MRL's counsel with an opportunity to make an offer of proof. The testimony Dean would have provided asserted that he spoke with MRL personnel and persuaded them to give Jane Byard and another worker, Frank Bennett, a second chance to interview for the job. Dean would have further testified that he called Jane Byard to discuss a second interview and she refused to interview for a second time. Byard argues that this testimony is contrary to MRL's answer to Admission 15 in Byard's second set of interrogatory requests. Admission 15 provides:

> You state in your December 13, 1989 answer to Interrogatory No. 25 that Frank Bennett was given an opportunity to meet with Mr. Grewell to reconsider Mr. Bennett's rejection. Please admit that MRL did not give Jane Byard an opportunity to meet with John Grewell to reconsider her rejection. . .

MRL's answer stated:

> It is admitted that Montana Rail Link agreed to reconsider its rejection of Mr. Bennett if Mr. Bennett would come back and meet with Mr. Grewell and it is admitted that the same agreement was not made with respect to Jane Byard. The BLE never approached Montana Rail Link with the request, and Montana Rail Link will not speculate as to what its action would have been if

15

the approach were made.

Dean's testimony at trial would, indeed, be contrary to MRL's answer to Admission 15. At no time did MRL attempt to modify its answer or in any way indicate that it was to present contrary testimony.

"Under well established concepts of law, a party cannot take one position during pretrial discovery and then change its position at the time of trial or on appeal." Plouffe v. Burlington Northern Inc. (1986), 224 Mont. 467, 474, 730 P.2d 1148, 1153. Section 26-1-601, MCA, declares as a conclusive presumption:

> The truth of a declaration, act, or omission of a party, as against that party in any litigation arising out of such declaration, act or omission, whenever he has, by such declaration, act or omission, intentionally led another to believe a particular thing true and to act upon such belief.

In the instant case, MRL admitted that Byard did not receive a second interview from MRL and that admission was never modified. Therefore, MRL was estopped from presenting contrary testimony at trial. Plouffe, 730 P.2d at 1153.

In conclusion, the hearing examiner did not abuse her discretion when she correctly excluded Dean's testimony.

## IV. DISPARATE TREATMENT

MRL argues that the hearing examiner erred in concluding that it treated Byard in a discriminatory fashion because it had a legitimate reason for not hiring her. Byard asserts that there is substantial evidence for the Commission's conclusion that MRL subjected Byard to discriminatory treatment.

A three-part analysis is used to determine whether a party has

16

been subjected to discriminatory treatment. First, the complainant must establish a prima facie case of discrimination. This is accomplished by showing that:

> 1) she is a member of a protected group;
> 2) she applied and had the necessary qualifications for the job;
> 3) despite her qualifications, she was rejected:
> 4) following the rejection, the position remained open and the employer continued to seek applicants from persons with complainant's qualifications

McDonnell Douglas Corp. v. Green (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed. 2d 668.

Second, if she can establish a prima facie case, the burden shifts to the employer "to articulate some legitimate, non-discriminatory reason for the employee's rejection." McDonnell Douslas, 490 U.S. at 802. We speak here of the burden of production, not of persuasion. The burden of persuasion remains with the complainant throughout the analysis. The employer need only set forth some legitimate reason for rejecting the employee, it does not have to prove this reason was the motivation to reject the complainant. However, if it can set forth a reason, the complainant's prima facie case is considered rebutted. McDonnell Douslas, 411 U.S. at 802-803.

The third step in the analysis provides for an opportunity for the complainant to prove that the legitimate reasons given for the employer's failure to hire are a pretext for discrimination. "This burden now merges with the ultimate burden of persuading the court that [plaintiff] has been the victim of intentional discrimination." Johnson v. Bozeman School Dist. No. 7 (1987), 226

17

Mont. 134, 140, 734 P.2d 209, 213, citing Texas Dept. of Community Affairs v. Burdine (1981), 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L. Ed. 2d 207, 217.

Byard successfully passed the first step and made out a prima facie case of discriminatory treatment. She is a member of a protected class (women) and she certainly qualifies as an engineer because she worked in that position for BN for 9 years. John Grewell, himself, admitted she was a good engineer. She was rejected for the position but MRL continued to search for candidates at her level of qualifications. Indeed, many of the engineers selected or trained for the position did not possess her level of expertise as a railroad engineer.

Once Byard's prima facie case of discrimination was established, it fell to MRL to rebut the case with a legitimate reason for it to reject her as an applicant. MRL stated that their reason for rejecting Byard was a "poor attitude" allegedly evinced during her brief interview with Grewell and Harper. Since MRL has merely the burden of production, this answer suffices to rebut Byard's prima facie case, "raising a genuine issue of fact as to whether it discriminated against the plaintiff." Johnson, 734 P.2d at 212, citing Texas Dewt. of Communitv Affairs, 450 U.S. at 254-255, 101 S.Ct. at 1094, 67 L. Ed. 2d at 216.

Rebutting the presumption of discriminatory treatment brings the analysis to the third and final step - Byard has the opportunity to prove that the legitimate reason given for the failure to hire is a pretext for sex discrimination. In the

18

Commission's Findings of Fact, Conclusions of Law and Final Order, it states that "MRL was not consistent or forthright regarding its explanation for rejecting Byard." The Commission recounts the sequence of events which concluded in MRL giving its reason to reject Byard as displaying a poor attitude during her interview. According to the findings of fact, Byard was initially told by a MRL representative that she was not hired because she did not sign her application. She attempted to correct that misconception by informing MRL's representative that she had in fact, signed her application. (We note that several people were hired by MRL despite not signing their applications.) After she clarified the situation, she was not given any reason for her rejection.

Even after she filed her action before the Human Rights Commission, MRL continued to prove hard to pin down concerning its reason for rejecting Byard. During the Commission's investigation of Byard's claim, MRL was asked to "state the specific reason(s) why [Byard] was not hired and how the person(s) hired were better qualified...." MRL answered that "[a]pplicants hired met minimum job qualifications for the position and passed the required pre-employment physical." The notarization of personnel manager Prinzing's signature for this information was dated May 10, 1988, eight months after Byard's hiring was rejected.

In the fact-finding conference on June 30, 1988, MRL presented a written position statement but no mention is made as to why Byard was not hired. It was at this conference that MRL's representative finally orally informed everyone that their reason for not hiring

19

Byard was her "poor attitude." The Commission concluded that "[t]he credibility of MRL's asserted reason for not hiring Byard is seriously undermined by the fact that MRL took almost six months to articulate the reason, despite two or three earlier specific requests to do so."

We agree. "Pretext may be proved indirectly, by showing that the employer's explanation is unworthy of belief." Hearing Aid Institute v. Rasmussen (1993), 50 St.Rep. 569, 573, ___ Mont. ___, 052 P.2d 628, 634. It is difficult to believe that "poor attitude" was the actual reason Byard was not hired when MRL did not explain its position until the June 30 conference. The inconsistency belies its assertion that it had a legitimate reason for rejecting Byard.

The hearing examiner correctly concluded that Byard successfully established that she was subjected to discriminatory treatment by MRL.

## V. DISPARATE IMPACT

Byard also argued that MRL's hiring practices had a disparate impact on women in general.

> [C]laims that stress 'disparate impact'...involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive... is not required under a disparate-impact theory. (Citation omitted.)

Hazen Paper Company, Et. Al., Petitioners v. Walter F. Biggins (1993), ___ U.S. ___, 113 S.Ct. 1701, 123 L. Ed. 2d 338.

To establish disparate impact, the respondent here must

20

"demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." Wards Cove Packing Co. v. Atonio **(1989),** 490 U.S. 642, 109 S.Ct. 2115, 104 L. Ed. 2d 753. A link between the particular employment practice and its resultant disparate impact establishes a prima facie case of "disparate impact." If a prima facie case is proven, the burden of production shifts to the employer, MRL, to articulate a legitimate business justification for the challenged practices. Ward's Cove, 490 U.S. at 658.

If the [employer] is able to produce a business justification for the practice at issue, the respondent must then be given an opportunity to persuade the factfinder that **"other** tests or selection devices, without a similarly undesirable [discriminatory] effect, would also serve the employer's legitimate [hiring] **interest[s];** by so demonstrating, **respondent[s]** would prove that [employers were] using [their] tests merely as a 'pretext' for **discrimination."** Ward's Cove, 490 U.S. at 660. (Citation omitted.) Alternatives provided by the respondent "must be equally effective as [employer's] chosen hiring procedures in achieving [its] legitimate employment **goals."** Ward's Cove, 490 U.S. at 661.

In the instant case, the Commission's final order lists the following five hiring practices by MRL as resulting in a disparate impact on women:

> 1) although not stated to the applicants, the impression of the individuals responsible for making the hiring decisions toward the applicants was the single most important factor in the hiring process:
> **2)** the individuals responsible for making hiring decisions followed **"no** written instructions pertaining to

21

the qualifications necessary for [hiring];"

3) the "standards which were determined to be controlling [were] vague and subjective;*'

4) the applicants were not properly informed, and indeed may have been misled about "the qualifications necessary to get jobs" and about the procedures they had to follow in order to be hired; and

5) "there are no safeguards in the [hiring] procedure designed to avert discriminatory practices.*'

These practices are quite similar to the transfer/promotion practices found violative of Title VII, the federal statute for employment discrimination, in Rowe v. General Motors Corporation (5th Cir. 1972), 457 F.2d 348. The procedures found to violate Title VII in Rowe included:

(i) The foreman's recommendation is the indispensable single most important factor in the promotion process.
(ii) Foremen are given no written instructions pertaining to the qualifications necessary for promotion.
(iii) Those standards which were determined to be controlling are vague and subjective.
(iv) Hourly employees are not notified of promotion opportunities nor are they notified of the qualifications necessary to get jobs.
(v) There are no safeguards in the procedure designed to avert discriminatory practices.

Rowe, 457 F.2d at 358-359.

We agree that practices of this type can easily lead to discrimination. In the instant case, MRL hired Sharon Prinzing, then of Montana Resources, to conduct a seminar on interviews and interviewing techniques in Billings, Montana. (We note that not all of MRL's interviewers were present for the seminar.) Prinzing provided materials such as interview plans and guides with suggestions for appropriate questions, opening remarks and other suggestions for a proper interview. These materials were distributed and/or placed on a conference table in the meeting room

22

where management involved in the interviewing process could pick up the materials if they so desired. Ms. Prinzing, however, did not know whether these materials were collected by the interviewers because there was no requirement to use the materials. She did not go over each page individually, but informed them that she used the materials in her own interviews.

One page of the materials from the seminar included information from the State of Montana concerning discrimination and bias in interviews. However, there was no discussion during the training about bias and stereotyping in the interview process.

Here, MRL admitted that "[t]he provided forms were only filled out for one or two applicants." The "interviews" for some applicants were nothing more than "informal chats" and some applicants hired were not interviewed at all. Additionally, there were no written job descriptions provided to alert possible applicants to the qualifications and expectations of a worker. Although Prinzing stated that MRL did not have written job descriptions, the implementing agreement between MRL and the BLE contained job descriptions for some positions, including engineers.

The interview process for each interviewer was left entirely to his discretion. Maureen Fleming, an industrial psychologist, had many concerns with the "informality" of the interview process at MRL.

Fleming, one of Byard's experts, testified that "there was a great lack of consistency in the selection process as it occurred." She stated that the use of the interview plan introduced by Sharon

23

Prinzing in her seminar on interviews would have been acceptable for use in interviewing but from her review of the applications and the discovery materials, it did not seem to have been used. She further asserted that there was not sufficient data about the applicants to make an adequate selection decision. She also stated that it would be important to have written pre-employment screening procedures and employment standards. In addition, she stated that it would be poor policy not to have written notes from the interviews as well as a written record of who was hired, fired and other information pertinent to the hiring process. She noted that it was "critically important" to maintain written data concerning interviews if operating within a short time frame for hiring.

Finally, Dr. Fleming stated that using subjective criteria without written guidelines and written data could have an adverse effect on minority groups because "an unstructured interview would reflect the biases and the prejudices of the interviewers and not really gather good data, because the structure would not be there to ask consistent questions of the minority or the women; the protected classes." A particular finding of fact by the Commission reflects the biases and prejudices of two of the interviewers:

> During interviews, at least two of MRL's hiring officials openly expressed their concerns about the ability of some women to perform railroad work. Jim Watkins asked an unmarried female applicant with a baby what her childcare arrangements were because, in his words, "railroad work would be tough on a lady in that position." George Harper commented to at least 2 female applicants, both of whom had several years experience as brake-and switch-person at BN, that "most women can't handle" railroad work.

We concur with Dr. Fleming's assessment of the interview

24

process, as well as the Commission's conclusion that the interview techniques used were inadequate. The fact that interviewers did not follow any written or organized interview plan produced interviews that were infused with stereotyping and the biases of the interviewers. The Commission concluded that "[s]ubjective procedures when combined with statistical evidence showing the disproportionate number of women selected to fill operating positions conclusively demonstrates the existence of discriminatory practices."

Byard was able to obtain some general statistics from MRL but record keeping at MRL was "spotty". MRL did acknowledge that it employed 111 females and 958 males, of which 51 women and 9 men were in the "Office & Clerical" category. The personnel manager could not provide a breakdown for the number of women hired as engineers or Utility Operating Employees (UOEs) or relate which positions fell into which category of workers. The following footnote was included in the Commission's final order:

> In addition to "Office & Clerical" the report includes categories for "Home," "Officials & Managers," "Professionals," "Technicians," "Craftsman (skilled)" "Operatives (semi-skilled)," and "Laborers (unskilled)." It is reasonable to infer that the positions of engineer and utility operating employee are included in "Craftsmen (skilled)," considering Grewell testified that he had to hire 350 employees in the operating department alone at startup and it was understood that the operating department included engineers, assistant engineers, lead utility employees and utility operating employees.
> There are 683 employees under the "Craftsmen (skilled)" category, 35 of which are women. The only other category with a sizeable number of employees (221) was unskilled laborers and, according to the report, all of those employees are male. The record discloses that MRL has at least one female engineer and at least one female operating employee, therefore, the positions of

25

engineer and operating employee must be included under the heading "Craftsmen (skilled)" and, whatever the precise number of women employed by MRL as engineers and UOEs, the combined total does not exceed 35.

Although employers are required to maintain personnel and employment records under the Montana Human Rights Act and Title VII, the only employment records MRL maintained were applications. In fact, it could not even provide a complete set of applications, missing at least 22 applications for engineers hired.

However, disparate impact can still be proved even when statistics, which are generally used to prove disparate impact, are inadequate.

The Uniform Guidelines on Employee Selection Procedures, adopted by the Equal Employment Opportunity Commission, the Civil Service Commission, the Department of Labor, and the Department of Justice, are guidelines designed to assist employers . . . "to comply with requirements of Federal law prohibiting employment practices which discriminate on grounds of race, color, religion, sex, and national origin." 29 CFR § 1607.1(B). The guidelines are based upon court decisions, previous agency guidelines and the practical experiences of the various agencies and are "intended to be consistent with existing law." 29 CFR § 1607.1(C).

29 CFR § 1607.4(D), describes the policy to be followed in the event that an agency does not maintain data on adverse impact:

> Where the user has not maintained data on adverse impact as required by the documentation section of applicable guidelines, the Federal enforcement agencies may draw an inference of adverse impact of the selection process from the failure of the user to maintain such data, if the user has an underutilization of a group in the job category, as compared to the group's representation in

26

the relevant labor market or, in the case of jobs filled from within, the applicable work force.

CFR § 1607.4(D).

We find the above regulation instructive and apply its principle to the instant action. Although the original labor pool for engineers was BN Southline engineers, as MRL began having trouble hiring a sufficient number of start-up employees, the labor pool increased to persons with engineering experience on Class I railroads and beyond that pool to those persons with any railroad experience, not necessarily as engineers. According to John Grewell's testimony, MRL hired many UOEs and trained them to become engineers. The Commission's finding of fact 153 states that "[c]onsidering the fact that some UOEs who were hired had no railroad experience, the pool could be as broad as the general labor market."

In view of the fact that MRL had hired 119 engineers when it began operations and only one of those engineers was a female, MRL underutilized women, a protected group, in its job categorization for engineers/"craftsmen" as compared to the number of women in the labor pool and the Court may infer adverse impact on women. See Teamsters v. United States (1977), 431 U.S. 324, 340, 97 S.Ct. 1843, 52 L. Ed. 2d 396, n. 20: Dothard v. Rawlinson (1977), 433 U.S. 321, 329-330, 97 S.Ct. 2720, 53 L. Ed. 2d 786.

Additionally, in a case such as this, where an employer cannot or will not supply records necessary to make a determination of disparate impact, a case may be established "without elaborate statistical proof." Wright v. National Archives & Records Service

27

(4th Cir. 1979), 609 F.2d 702, 712. For instance, courts can infer disparate impact on a protected class from the use of word-of-mouth advertising.

MRL relied heavily on word-of-mouth advertising to recruit possible job applicants. The Commission found that inexperienced males who heard about openings as UOEs were hired while females with similar employment backgrounds were not hired. It further found that Grewell did not even see the applications of rejected female applicants, who had railroad experience.

In concluding that "[w]ord-of-mouth recruiting can have the effect of perpetuating imbalances in the applicant pool, with a corresponding effect on minority hiring," the Commission cited E.E.O.C. v. Chicago Miniature Lamp Works (N.D. Ill. 1985), 622 F. Supp. 1281, 1309, which states that without contradictory evidence, the assumption is that word-of-mouth recruitment of applicants maintains the status quo for the composition of the work force. Here the work force was traditionally composed of males.

However, this case was reversed by the United States Court of Appeals, Seventh Circuit in E.E.O.C. v. Miniature Lamp Works (7th Cir. 1991), 947 F.2d 292. The Seventh Circuit stated that although "reliance on word-of-mouth to obtain applicants for jobs does not insulate an employer from a finding of disvarate treatment of minorities," it could not consider the word-of-mouth advertising at issue because it was emvlovee initiated. Miniature, 947 F.2d at 305. Miniature passively relied on employees' word-of-mouth recruiting to bring applicants to Miniature. "[F]or the purposes

of disparate impact, a more affirmative act by the employer must be shown in order to establish causation." Miniature, 947 F.2d at 305.

In the instant case, MRL was the impetus behind the word-of-mouth recruiting, even obtaining assistance from the BLE. The Commission found that "MRL relied upon word-of-mouth recruitment to seek applicants beyond the pool of Southline BN employees. . . ." and "MRL's policy of word-of-mouth recruiting affected female applicants quite differently than male applicants." Recruitment by word-of-mouth was initiated and encouraged by an affirmative act of MRL, which perpetuated the imbalance between males and females employed by MRL.

The sparse statistics, coupled with evidence which carries with it an inference of disparate impact, are adequate to validate Byard's claim of disparate impact. She has also sufficiently substantiated her assertion that the disparate impact on women was caused by the subjective hiring practices of MRL. Because Byard has successfully established a prima facie case of disparate impact, the analysis moves to the second step.

In the second step of the analysis, the petitioner must produce a legitimate business justification for its hiring practices. MRL argued that it had to hire a great number of employees in a relatively short span of time and therefore, could not develop a sophisticated format for the interviewing process. This explanation suffices as MRL's legitimate justification for its hiring procedures which shifts the burden of production back to

29

Byard to provide alternatives to the hiring procedures utilized by MRL.

Byard's expert, Dr. Fleming, testified that even if an organization is operating under a "short time frame," it can look at other companies selection procedures and systems and apply them to its own circumstances. She suggested that if the interview plan provided by Sharon Prinzing had been used, it would have improved the selection process. Dr. Fleming also stated that it is critical for an organization hiring within a short time period to keep written data of the hiring process. She further stated that job analyses and job descriptions from another firm would be very helpful in developing effective hiring procedures and would be readily available.

These are certainly common sense solutions to the problem of MRL's short time frame for hiring numerous employees. These materials were available or easily accessible, particularly because another railroad, BN, had already proven cooperative in MRL's attempt to hire employees. In addition, MRL had job descriptions for some of the railroad craftsmen positions readily available from its labor agreement with BLE.

We conclude that there is substantial credible evidence to prove that other selection practices would serve MRL's legitimate hiring interests and were readily available, proving that MRL used its hiring practices as a pretext for discriminatory conduct. Ward's Cove, 490 U.S. at 660. In fact, testimony showed that the alternative hiring practices suggested by Byard would not only

prove as effective, but actually more effective in improving the quality and equality of the hiring process at MRL. We conclude that the hearing examiner correctly determined that MRL's hiring practices had a disparate impact on women.

AFFIRMED.

We note with dismay the deplorable state of the record which arrived for our review in this case. Incomplete and disorganized records waste time and energy, which we simply do not have to spare, and significantly delay the final decision on appeal. In the future we will not hesitate to return the entire record to the district court with instructions that it will not be refiled until it is complete and in proper, organized form.

_____
Justice

We Concur:

_____

_____

_____

_____
Justices

31