No. 97-524

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 142N

IN RE T.A.G.,

A Youth in Need of Care.

APPEAL FROM: District Court of the Twelfth Judicial District,

In and for the County of Hill,

The Honorable John Warner, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jeremy S. Yellin, Attorney at Law; Havre, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Jennifer Anders,

Assistant Attorney General; Helena, Montana

David G. Rice, Hill County Attorney; Havre, Montana

Guardian Ad Litem:

Robert M. Peterson, Attorney at Law; Havre, Montana

Submitted on Briefs: March 18, 1999

Decided: June 15, 1999

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1. Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2. The Hill County Attorney filed a petition on behalf of the Department of Public Health and Human Services in the District Court for the Twelfth Judicial District, Hill County, to terminate the parental rights of the mother of T.A.G. The District Court granted the petition, ordered that the mother's parental rights were terminated effective immediately, and gave the Department of Public Health and Human Services permanent legal custody of T.A.G. with the right to consent to her adoption. The mother appeals the District Court order. We affirm the judgment of the District Court.

¶3. The following issues are presented on appeal:

¶4. 1. Did the District Court err when it found that evidence that T.A.G. was enrolled or eligible for enrollment in the Fort Belknap Tribes was inconclusive?

¶5. 2. Did the District Court err when it denied the mother's motion to continue?

¶6. 3. Was the mother's counsel ineffective because he did not object to the State's failure to notify the Tribe of the termination proceeding as mandated by 25 U.S.C. § 1911(b), because he failed to petition the court to transfer jurisdiction to the Tribal Court, and because he did not raise the issue of the State's compliance with the Americans with Disabilities Act?

¶7. 4. Did the District Court err when it found that the requirements of § 41-3-609(1)(e)(i) and (2)(a), MCA, had been satisfied?

## FACTUAL BACKGROUND

¶8. T.A.G. was born May 6, 1994 with a rare inherited metabolic disorder, phenylketonuria, commonly referred to as PKU. Children with PKU are unable to break down proteins in food and buildup of phenylalanine in the blood and body

tissues results. If not treated, children with PKU will suffer irreparable and irreversible neurological damage, and become permanently mentally retarded and unable to care for themselves. Treatment of children with PKU requires strict adherence to special dietary needs which includes protecting the child from "natural foods," and supplementing their diets with "medical foods." Afflicted children cannot eat foods containing proteins, meats, dairy products, breads, and grain and cereal products. Sheltering children from "natural foods," providing supplemental foods in quantities sufficient to provide the calories and nutrients necessary, and teaching the child how to eat properly is extremely difficult, and requires careful monitoring and compliance. As the child grows older, teachers, friends and any other people the child comes into contact with must also be educated about PKU and the necessity of protecting the child from natural foods. When combined with the normal rigors of child-rearing, a tremendous amount of organization and discipline is required.

¶9. T.A.G.'s mother has a chronic organic brain disorder as a result of a craniotomy to remove a fibrocystic tumor in her brain when she was thirteen. As a result of her disability, she has memory problems, problems with recall and with processing information, difficulty organizing her thoughts, and a low tolerance to stress. Everyday living is a difficult task for the mother. She has difficulty keeping appointments and staying on schedules. T.A.G.'s father formally relinquished his parental rights because of disabilities caused by a motorcycle accident.

¶10. In September 1995, the Department of Public Health and Human Services received a referral regarding the mother and T.A.G. They were at the Women's and Family Shelter in Billings, and the mother was having trouble fixing a bottle. There were concerns that the mother was not providing adequate care for T.A.G. Apparently the mother planned to return to Havre where she resided, but lost the money for the bus ticket. T.A.G. was placed in a foster home, and a maternal aunt picked T.A.G. up from the foster home. A paternal uncle and aunt then took T.A.G. to live with them, and she has remained with them since that time.

¶11. In an effort to return T.A.G. to her mother, the Department formulated a treatment plan, which the court then imposed. The court ordered that temporary custody of T.A.G. be continued with the aunt and uncle who live in Shelby.

¶12. The treatment plan required that the mother continue to work with the dietician

that she had been working with since the birth of T.A.G. The plan was designed to help the mother with her meal planning skills, and with T.A.G.'s strict dietary requirements. She was required to develop meal plans and attend parenting classes. Visitation times were then arranged during which the mother was required to keep a list of foods she fed to T.A.G.

¶13. On March 21, 1997, the Hill County Attorney, on behalf of the Department, filed a petition to terminate parental rights. Based upon all of the evidence presented at trial, the District Court found that the mother's condition, "without fault on her part," prevented her from providing the necessary care for T.A.G. Therefore, the court ordered that the parental rights of the mother and father, who had previously relinquished his parental rights, were to be terminated.

## STANDARD OF REVIEW

¶14. We review a district court's decision in a youth in need of care case to determine whether it correctly interpreted the law, and whether its findings of fact are clearly erroneous. *See In re A. W-M.,* 1998 MT 157, 289 Mont. 333, ¶¶ 8-9, 960 P.2d 779, ¶¶ 8-9; *see also Daines v. Knight* (1995), 269 Mont. 320, 324, 888 P.2d 904, 906 (discussing three-part test for determining whether findings of fact are clearly erroneous).

¶15. We have held that a parent's right to care for, and have custody of, their child is a fundamental right, and that district courts must, therefore, adequately address all applicable statutory requirements. *See In re A. W-M.,* ¶¶ 8-9.

¶16. The standard of review of discretionary district court rulings is whether the court abused its discretion. We have held that "[t]he abuse of discretion standard applies to trial administration issues, post-trial motions and similar rulings." *Lynch v. Reed* (1997), 284 Mont. 321, 326, 944 P.2d 218, 221-22 (quoting *Montana Rail Link v. Byard* (1993), 260 Mont. 331, 337, 860 P.2d 121, 125).

## ISSUE 1

¶17. Did the District Court err when it found that evidence that T.A.G. was enrolled or eligible for enrollment in the Fort Belknap Tribes was inconclusive?

¶18. The threshold inquiry in this case is whether T.A.G. is an "Indian child" within the meaning of the Indian Child Welfare Act (ICWA) of 1978, 25 U.S.C. §§1900-1934. "Indian Child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C.A. §1903(4). Tribes have the power to determine tribal membership unless otherwise limited by statute or treaty. *See Adams v. Morton* (9th Cir. 1978) 581 F.2d 1314. Moreover, for ICWA determination purposes, tribes have ultimate authority to decide who qualifies as an "Indian child." *See In re Adoption of Riffle* (1995), 273 Mont. 237, 242, 902 P.2d 542, 545 (discussing Department of Interior Guidelines promulgated to aid state courts in ICWA cases).

¶19. In its order terminating parental rights, the District Court found that the evidence in the record was inconclusive as to whether T.A.G. was enrolled or eligible for enrollment in an Indian Tribe. At the commencement of the action, which was originally filed in Yellowstone County, the Tribes of the Fort Belknap Reservation were sent notices of the pending action. With the consent of both courts and all of the parties, the case was then transferred to the Hill County District Court because the mother resided in Havre. Notice of the action was again sent to the Fort Belknap Tribes. The Tribes did not intervene or respond in any way to the notices. Without the Tribes' intervention or response, T.A.G.'s status as an Indian child could not be established.

¶20. At the hearing on the motion to terminate parental rights, which was held on June 10, 1997, counsel for the mother, when questioned by the court, stated that T.A.G. was not an enrolled Tribal member at that time. The mother then testified that T.A.G. was enrolled. Upon further questioning, the mother testified that she had sent the paperwork along with T.A.G.'s birth certificate to the U.S. Bureau of Indian Affairs to have her enrolled. She further testified that she had not spoken with anyone since sending the paperwork to the Bureau of Indian Affairs. There was no evidence that the Fort Belknap Tribes had determined that T.A.G. was a member or eligible for membership in the Tribes.

¶21. After a careful review of the record, we conclude that the District Court's finding regarding T.A.G.'s status was not clearly erroneous.

ISSUE 2

**¶22. Did the District Court err when it denied the mother's motion to continue?**

**¶23. The afternoon prior to the hearing on the petition to terminate parental rights, the mother filed a motion to continue and a brief in support thereof. The supporting brief stated that:**

This motion was made on the ground . . . [that the mother] wishes to invoke the protections of the Indian Child Welfare Act, 25 U.S.C.A. Sections 1901, et seq. . . . .

She wishes to have the Fort Belknap Tribe intervene and <u>assume jurisdiction in the matter of the custody of her child</u> . . . .

The undersigned has been informed today that it is the practice of the Fort Belknap Tribe to intervene in child protection matters in which the parent asks the Tribe to intervene.

(Emphasis added.) Additionally, the mother asserted that the Child Services Coordinator of the Fort Belknap Tribe was at a training seminar and, therefore, was unavailable to meet with her regarding intervention. She also asserted that the Child Services office of Fort Belknap was in the process of moving at approximately the time that the notices of the State court proceedings were sent to the Tribes, and that some documents may have been misplaced because documents had been lost in the past. Therefore, the mother asserted that it was possible that the Tribes' failure to intervene may not have been an intentional decision not to intervene in the action, but was inadvertent.

**¶24. At the hearing on the petition to terminate parental rights, the court stated that under the circumstances, the motion to continue was denied and for the benefit of T. A.G., the matter would proceed.**

**¶25. The Indian Child Welfare Act, 25 U.S.C. § 1911(b) and (c) allows for transfer to tribal court or tribal intervention in the action, and states that:**

(b) Transfer of Proceedings; declination by tribal court

In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: Provided, That such transfer shall be subject to declination by the tribal court of such tribe.

(c) State court proceedings; intervention

In any State Court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.

Absent a clear determination that T.A.G. was eligible for enrollment, the Tribes would not have had the authority to intervene or have the action transferred to tribal court.

**¶26. Furthermore, the proceedings regarding the placement of T.A.G. originally commenced in 1995. The Fort Belknap Tribes were notified two times of the pending state court proceedings. The Tribes failed to respond to both notices. We have held that Tribes effectively decline transfer of jurisdiction or intervention when they fail to request transfer or to intervene in the state court proceedings after being notified of such proceedings. *See In re A.P.*, 1998 MT 176, ¶ 21, 289 Mont. 521, ¶ 21, 962 P.2d 1186, ¶ 21.**

**¶27. Finally, assuming the mother's motion to continue should be construed as a motion to transfer or allow intervention, it was not made until nearly two years after the state court proceedings had commenced. As the District Court stated, the motion came at the "eleven and a half hour," late the afternoon prior to the hearing on the petition to terminate parental rights. We have previously discussed the federal guidelines addressing the promptness of tribal interventions in ICWA cases in state courts. *See In re A.P.*, ¶ 26. The federal guidelines state that:**

This section [25 U.S.C. 1911(c)] specifies that requests are to be made promptly after

receiving notice of the proceeding . . .While the Act permits intervention at any point in the proceeding, it does not explicitly authorize transfer requests at any time. Late interventions do not have nearly the disruptive effect on the proceeding that last minute transfers do . . . . Although the Act does not explicitly require transfer petitions to be timely, it does authorize the court to refuse to transfer a case for good cause. When a party who could have petitioned earlier waits until the case is almost complete to ask that it be transferred to another court and retried, good cause exists to deny the request.

*In re A.P.*, ¶ 26 (quoting 44 Fed. Reg. 67590 (1979)) (emphasis added). The mother's motion to continue stated that she wanted the "Fort Belknap Tribe to intervene and assume jurisdiction in the matter," and that she "wishes to have questions regarding care and custody of . . . [T.A.G.] decided by the Fort Belknap Tribal Court." Such language indicates that the mother wanted not only intervention but ultimate transfer to the Tribal court.

**¶28. In this case, the District Court had good cause to deny the mother's request. Ample evidence existed that the Tribes declined to intervene and would do so again if asked by the mother. Additionally, the mother had more than sufficient time to request the Tribes to intervene. Finally, and perhaps most importantly, as the court stated at the commencement of the termination hearing, proceeding with the matter was in the best interests of T.A.G.**

**¶29. We conclude that the District Court did not abuse its discretion when it denied the mother's motion to continue.**

ISSUE 3

**¶30. Was the mother's counsel ineffective because he did not object to the State's failure to notify the Tribe of the termination proceeding as mandated by 25 U.S.C. § 1911(b), because he failed to petition the court to transfer jurisdiction to the Tribal court, and because he did not raise the issue of the State's compliance with the Americans with Disabilities Act?**

A. WAS THE MOTHER'S COUNSEL INEFFECTIVE WHEN HE DID NOT OBJECT TO THE STATE'S FAILURE TO NOTIFY THE TRIBE OF THE TERMINATION PROCEEDING?

**¶31. On appeal, the mother contends that her court-appointed counsel in the proceedings below was ineffective for not objecting to the court's failure to notify the Tribes of the termination hearing. She contends that the Tribes were not notified of the termination proceeding as mandated by the ICWA, 25 U.S.C. § 1912(a). 25 U.S.C. § 1912(a) provides that:**

In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and of their right of intervention . . . .

**¶32. At the commencement of the state court proceedings, the Tribes were twice notified of the pending state court action as required by the ICWA. The Tribes did not respond and did not intervene at that time. Failure of the Tribes to intervene could reasonably be interpreted to mean that they declined to intervene or assume jurisdiction in the case.** *See In re A.P.***, ¶ 21. The State complied with the requirements of the ICWA when it sent the first two notices of the pending state court proceedings. The State was not required to send a third notice to the Tribes.**

**¶33. We conclude that the mother's counsel was not ineffective for failing to object to the State's failure to notify the Tribes of the petition to terminate the mother's parental rights.**

B. WAS THE MOTHER'S COUNSEL INEFFECTIVE BECAUSE HE FAILED TO PETITION THE COURT TO TRANSFER JURISDICTION TO THE TRIBAL COURT?

1. Failure to File a petition to Transfer.

**¶34. The mother's counsel, rather than filing a petition to transfer jurisdiction to the Tribal Court, filed a motion to continue. The brief in support of the motion to continue stated that it was made on the "ground that . . . [the mother] wishes to invoke the protections of the Indian Child Welfare Act, 25 U.S.C.A. Section 1901, et**

seq." The brief further stated that the mother is an enrolled tribal member, and that she wished "to have the Fort Belknap Tribe intervene <u>and assume jurisdiction in the matter of the custody of her child."</u> (Emphasis added.) In our previous discussion, we assumed that the motion to continue was, in substance, a motion to transfer, and that the court did not abuse its discretion when it was denied. Therefore, counsel for the mother was not ineffective for failing to file a motion to transfer.

2. The District Court's Failure to Hold a Hearing On the Motion to Transfer.

¶35. The mother also argues that a hearing on the motion to transfer jurisdiction was required but not conducted. In support of her argument, she cites to *In re G.L.O.C.* (1983), 668 P.2d 235, 237. That case is inapposite to the present case, however, because in that case, there had been a determination that the child was an "Indian child" for ICWA purposes. We stated that:

[U]nder the Indian Child Welfare Act, a jurisdiction hearing is required before the court can enter an order either granting or denying a request for the transfer of jurisdiction of Indian children to tribal custody. Such a hearing is required whenever the Indian children live outside of a reservation.

*In re G.L.O.C.*, 205 Mont. at 356-57, 668 P.2d at 237. As we concluded in Issue 1, the question of whether T.A.G. was an "Indian child" within the meaning of the ICWA was the threshold question in this case. The District Court found that the evidence was inconclusive that T.A.G. was an "Indian child," and we affirmed.

¶36. Therefore, we conclude that the District Court did not err when it did not hold a hearing on the motion to transfer jurisdiction to the Tribal court.

C. WAS THE MOTHER'S COUNSEL INEFFECTIVE FOR FAILING TO RAISE THE ISSUE OF COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT?

¶37. On appeal, T.A.G.'s mother contends that her trial counsel was ineffective for failing to assert that the State did not comply with the Americans with Disabilities

**Act (ADA), 42 U.S.C. §12132. The ADA in relevant part provides that:**

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. §12132.

**¶38. Prior to receiving the petition to terminate parental rights, the District Court ordered that T.A.G.'s mother successfully complete a formal treatment plan. The treatment plan was designed by the State to help the mother plan appropriate meals for T.A.G., protect her from the natural foods that are harmful to her, and understand T.A.G.'s needs. During the months of treatment, and indeed from the time of T.A.G.'s birth, the State provided special services to T.A.G.'s mother. The formal treatment plan required that the mother continue to work with the dietician that she had been working with since T.A.G.'s birth. She was required to develop meal plans and record on a daily basis the foods she herself consumed. She was also required to attend parenting classes. Visitation times were then arranged during which the mother was required to keep a list of foods she fed to T.A.G. She also was required to prepare meal plans prior to T.A.G.'s visits. Although the record indicates that the mother sincerely attempted to follow the treatment plan, she was unsuccessful in doing so.**

**¶39. The ADA requires that persons with disabilities shall not be excluded from participation in or deprived of the benefits of services of public entities. *See* 42 U.S.C. § 12132. It also requires that persons with disabilities not be discriminated against by public entities. *See* 42 U.S.C. § 12133. The Department did not deny T.A.G.'s mother its services. The record indicates that the Department worked with the mother extensively for several years in an attempt to help her acquire the skills necessary to care for the extraordinary needs of T.A.G. The ADA requires that <u>reasonable</u> accommodations be made to allow disabled persons to receive services or participate in programs. *See* 28 C.F.R. § 35.130(b)(7) (emphasis added). After carefully reviewing the record, the treatment plan, and the evaluations of physicians and psychologists regarding the needs of T.A.G. and the abilities of her mother, we conclude that the prescribed treatment plan was a reasonable attempt to accommodate the mother's needs. The ADA demands nothing more.**

**¶40. We conclude that trial counsel for the mother was not ineffective when he did not argue that the ADA had been violated.**

## ISSUE 4

**¶41. Did the District Court err when it found that the requirements of § 41-3-609(1)(e)(i) and (2)(a), MCA, had been satisfied?**

**¶42. In its order terminating the parental rights of T.A.G.'s mother, the District Court found that "beyond a reasonable doubt the requirements for termination required by § 41-3-609 have been met." The mother now asserts that the court erred in its finding because the treatment plan provided was not appropriate because it did not "enable her to meet her requirements." Section 41-3-609(1)(e)(i) and (2)(a), MCA require that:**

(1) The court may order a termination of the parent-child relationship upon a finding that any of the following circumstances exist:

. . . .

(e) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful;

(2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:

(a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time.

Subsection 3 of the statute in relevant part, goes on to provide that:

(3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child.

**¶43. For the reasons stated in the previous sections of our opinion, we conclude that the mother's treatment plan was appropriate. Furthermore, we conclude that the District Court properly considered the provisions of § 41-3-609, MCA in arriving at its decision, including the best interests of T.A.G. Accordingly, we affirm the judgment of the District Court.**

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

No

/S/ JIM REGNIER