No. 86-285

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

DOUGLAS PLOUFFE,

        Plaintiff and Respondent,

  -vs-

BURLINGTON NORTHERN, INC.,
a Delaware Corp.,

        Defendant and Appellant.

_____

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable John McCarvel, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Jardine, Stephenson, Blewett & Weaver; James E. Aiken,
Great Falls, Montana

    For Respondent:

        Erick Thueson, Great Falls, Montana

_____

Submitted on Briefs: Sept. 25, 1986

Decided: December 30, 1986

Filed: DEC 30 1986

_____
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Burlington Northern, Inc. appeals from an order by the District Court of the Eighth Judicial District, Cascade County, granting plaintiff Doug Plouffe's motion for summary judgment on the issue of liability under the Federal Employers Liability Act (Title 45 U.S.C., § 51, et seq.) and denying defendant's motion for a new trial. We affirm.

Three issues are raised on appeal. The first is whether the trial court erred in granting Plouffe's motion for partial summary judgment on the issue of liability under the Federal Employers Liability Act. The second is whether the trial court erred in denying Burlington Northern's motion for a new trial. The final issue is whether the trial court acted properly in denying Plouffe's motion for pre-judgment interest.

This action began when Plouffe sued his employer Burlington Northern (BN) under the Federal Employers Liability Act to recover for four separate on-the-job injuries received in 1979-1981. Plouffe maintained that his injuries were the result of BN's admitted violation of portions of the Federal Safety Appliance Act, 45 U.S.C. § 1, et seq. Hence, he argued, partial summary judgment on the issue of liability was proper, as BN's admissions precluded their raising questions of material fact. BN responded that a grant of partial summary judgment was improper in that it removed from consideration the issues of causation, contributory negligence and whether the defects existed.

The District Court granted Plouffe's motion for summary judgment on the liability issue, agreeing with Plouffe that

- 2 -

the railroad had admitted prior to trial that Plouffe's credibility concerning the accidents was not an issue and that defects were in fact the only explanation for the injuries. The court left the issue of medical causation to the jury.

Plouffe's complaint and motion for partial summary judgment were based on the Safety Appliance Act, 45 U.S.C. § 1, et seq. This federal safety statute was enacted to protect railroad employees and the public from injury caused by defective equipment on cars and locomotives. Urie v. Thompson (1949), 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282. In addition to this recognized end, the statute also has the effect of facilitating recovery under the Federal Employers Liability Act, since violation by a carrier of a specific safety requirement is held to constitute negligence as a matter of law, regardless of a showing of negligence on the employee's part. Urie; Coray v. Southern Pacific Co. (1949), 335 U.S. 520, 69 S.Ct. 275, 93 L.Ed. 208. The Safety Appliance Act "imposes absolute liability upon any carrier [violating] it." Callihan v. Burlington Northern, Inc. (1982), 201 Mont. 350, 355, 654 P.2d 972, 975. See, e.g. Anderson v. Burlington Northern, Inc. (Mont. 1985), 709 P.2d 641, 42 St.Rep. 1738; McGee v. Burlington Northern, Inc. (1977), 174 Mont. 466, 571 P.2d 784. Further, contributory negligence is not a factor in determining liability if the Safety Appliance Act has been violated. Title 45, U.S.C. § 53 states:

> . . . no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

"The statute expressly imposes liability upon the employer to pay damages for injury or death due 'in whole or in part' to its negligence." Rogers v. Missouri Pacific Railroad Co. (1957), 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493, citing 45 U.S.C. § 51. To prove liability as a matter of law, Plouffe need only to have established a "defect or insufficiency" due to the railroad's negligence. Title 45 U.S.C. § 51.

With these basic precepts in mind, we turn to the issue raised of the propriety of the District Court's granting partial summary judgment on the issue of liability for each of the injuries in question.

The first of the four accidents occurred on March 28, 1979, when Plouffe was working as a switchman in the Havre yard. He and his co-workers were moving a string of cars onto another track when he noticed that a flat car in the string would not roll properly. This is ordinarily caused by sticking brakes. To eliminate the problem, Plouffe first tried bleeding the air from the brakes. When this did not work, he attempted to release the brakes by turning the handbrake located on the end of the car. However, the handbrake was stuck and would not turn. (The handbrake is a vertical shaft with a wheel at its top. The wheel is perpendicular to the shaft.) Plouffe knew that sometimes the chain to the brake shaft would stick or get tangled and prevent the handbrake wheel from turning. As Plouffe bent to rattle the chain located under the car, the handbrake shaft slipped down, causing the handbrake wheel on the top of the shaft to hit Plouffe on the back of the head, knocking him to the ground. There were no witnesses to this accident.

The railroad raises several contentions. First, they argue that the issue of contributory negligence should have been submitted to the jury. Second, they claim that there was no proof that the handbrake was defective. Finally, they claim that Plouffe's credibility was an issue of fact that should have been decided by a jury but was wrongly precluded by summary judgment.

Title 45, U.S.C. § 11 provides that "[a]ll cars must be equipped with . . . efficient hand brakes. . ." Compliance with § 11 is "not simply a question of whether the brake is efficient; it is necessary that the brake can be operated with safety." Ballard v. Sacramento Northern R. Co. (1932), 126 Cal.App. 486, 14 P.2d 1045. If an inefficient brake causes injury, there is inescapable liability under the Federal Safety Appliance Act (FSAA), Title 45, U.S.C. §§ 11-16.

After the accident, Plouffe filed a personal injury report with the railroad. A train master for BN conducted a supervisory investigation which confirmed that the brake shaft wheel dropped and hit Plouffe on the back of his head. Burlington Northern never inspected the handbrake after the accident, although under its own operating and safety rules it had a duty to do so. Further, BN, through the person it designated as a safety expert, admitted that if the handbrake shaft and wheel came down, as it did without the latch being released, it would be defective. These facts, undisputed by BN, provide ample evidence to support the District Court's finding that the FSAA was violated because the equipment was defective. Further, the law provides that if this Act has been violated, then contributory negligence is not a factor in determining liability. In short, an inefficient brake

- 5 -

causes injury, there is inescapable liability. Title 45, U.S.C. §§ 11-16.

The United States Supreme Court discussed the absolute liability features of the Safety Appliance Act in Lilly v. Grand Trunk Western R. Co. (1943), 317 U.S. 481, 485-86, 63 S.Ct. 347, 87 L.Ed. 411, stating:

> Negligence is not the basis for liability under the act. Instead it "imposes upon the carrier an absolute and continuing duty to maintain the locomotive, and all parts and appurtenances thereof in proper condition and safe to operate . . . without unnecessary peril to life or limb. (Citations omitted.) Any employee engaged in interstate commerce who is injured by reason of a violation of the Act may bring his action under the Federal Employers Liability Act, charging the violation of the Boiler Inspection Act. The Act, like the Safety Inspection Act, is to be liberally construed in light of its prime purpose, the protection of employees and others by requiring the use of safe equipment."

In the instant case, absolute liability was properly imposed. The defective condition of the brake was undisputed and BN was unable to support its argument that a genuine issue of material fact existed. Hence, the District Court properly ruled that Plouffe was entitled to judgment as a matter of law.

BN also claims that summary judgment foreclosed raising Plouffe's credibility regarding the accident. This claim is inconsistent with the railroad's pre-trial activity where, during discovery, it did not dispute Plouffe's testimony about how the accident occurred. In fact, the railroad's claims manager made the following admissions during the taking of his deposition:

> Q. (By Plouffe's attorney): There is nothing in the claims file indicating that the accident occurred in any other way; correct? A. Not that I am aware of, no.
>
> Q. Do you know of any reasons to doubt that is precisely what occurred in this instance? A.

Doubt that Plouffe was hit on the head with the brake?

Q. Right. A. No.

Shortly following this dialogue, the railroad's attorney added the following:

> Q. (By Plouffe's attorney) . . . Is it Burlington Northern's position that they don't dispute Mr. Plouffe's description of how the accident occurred? A. (By BN's attorney) Based upon all the information I have in my review of the file, my discussion with (BN's claims manager), it's my understanding that there is no basis at this point that we are aware of nor witnesses who will say that it didn't happen the way Mr. Plouffe says it happened.
>
> * * *
>
> I will make it clear, however, that Burlington Northern certainly disputes the nature and extent of the injuries that relates to his back problems. You understand that?
>
> Q. I understand you are debating causation as far as that accident goes-- A. And its relationship to the overall problem, correct.
>
> Q. --but we are not fighting over how the accident occurred. That's what I am here for is to find that out. A. I am not aware of anything that suggests that Mr. Plouffe isn't telling the truth or that anybody saw it happen differently.

Under well established concepts of law, a party cannot take one position during pretrial discovery and then change its position at the time of trial or on appeal. Under § 26-1-601, MCA, the following is a conclusive presumption:

> The truth of a declaration, act, or omission of a party, as against that party in any litigation arising out of such declaration, act or omission, whenever he has, by such declaration, act or omission, intentionally led another to believe a particular thing true and to act upon such belief.

Here, the railroad claimsman and attorney clearly lead Plouffe to believe that the railroad was not contesting Plouffe's credibility concerning how the accident occurred. Hence, the railroad was estopped from making this argument at trial and may not raise this issue on appeal.

The second accident occurred on July 28, 1979 when Plouffe lost his footing while he was starting to climb down from an engine. Plouffe specifically remembers that he was looking where he was going because the deck on the locomotive had been worn so smooth that it had a "silvery finish." The cleats on the locomotive walkway, designed to prevent slipping, had been worn smooth. When he started to climb down from the engine, his feet flew out from under him and he bounced down the steps on his rear. There were no eyewitnesses to this accident.

Again the railroad presented no evidence to the District Court contradicting Plouffe's description of the accident. Nor did it meet its duty, under its own safety rules, to inspect the engine deck after the accident.

The railroad does not dispute that the walkway was smooth and defective. Indeed, the person designated by BN as a safety expert on locomotives admitted that the railroad violated its own safety rules by having a walkway where the metal cleats were worn down to the point where the deck was shiny.

The Federal Employers Liability Act provides that railroads have an absolute duty to maintain locomotives in such a condition as to prevent unnecessary peril to life or limb. Dallas v. Burlington Northern, Inc. (Mont. 1984), 689 P.2d 273, 41 St.Rep. 1902, 1906. In addition, federal regulations require that floors be properly treated to provide secure footing. Anderson v. Burlington Northern, Inc. (Mont. 1985), 709 P.2d 641, 42 St.Rep. 1738 (citing 49 CFR § 229.119(c)).

In this case, where the cleats of the walkway had been worn smooth, it's clear that an unnecessarily perilous

condition existed. In admitting this, the BN expert even went so far as to explain that the railroad should have taken precautionary measures of welding new cleats on the walkway. Here again, summary judgment based upon the Safety Appliance Act was proper. The District Court correctly held the railroad strictly liable for Plouffe's injuries, regardless of any contributory negligence.

The railroad claims that Plouffe's cause of action was for negligence, and not legitimately a violation of the FSAA, because there was a factual issue that Plouffe had oil on his boots and that the oil could have contributed to his fall. If this was the case, they argue, then there would be no violation of the FSAA and the railroad could only be liable for negligence for leaving the oil in the yard. However, the admission that the walkway lacked cleats precludes this theory, as the lack of cleats created an unnecessarily perilous condition. The questionable oily condition of Plouffe's boots was not a factor discussed in determining that the FSAA was violated.

The railroad also claims that Plouffe's credibility concerning this accident was in issue and that it was error for the District Court to deny it the opportunity to raise the credibility issue at trial. Here again the railroad is estopped because of its actions during discovery. The following exchanges took place during the deposition of the railroad's claims manager:

> Q. Was any evidence developed that contradicts Mr. Plouffe's statement by you concerning how the accident occurred? A. No one has told me that Mr. Plouffe did not slip on Unit 1835 and hurt his right arm.

> Q. Was any evidence developed indicating that Mr. Plouffe was somehow not telling the truth in that regard? A. Not that I am aware of.

Q. Do you know of any reason to doubt Mr. Plouffe's statement that he did slip on the step on Unit 1835? A. None whatsoever.

The railroad's attorney again followed this discussion with the following admissions:

I would make the same statement that I made earlier on the other accident [regarding the brake wheel] that while there is--I am not aware of any information, evidence or other witnesses who contradict what he has put down in his report. We do dispute the nature and extent of the injury, disability, from the [fall from the engine].

Whatever [Doug Plouffe] said took place before we don't dispute, whether he called it a fall or a slip or whatever it was.

Once again, Plouffe's attorneys were lead to believe that Plouffe's credibility was not an issue. Once again § 26-1-601 estops the railroad from raising this issue in the District Court or on appeal.

The third accident occurred on October 26, 1979. Plouffe was attempting to straighten a drawbar on a flat car. The drawbar is the heavy metal bar that supports the coupler. These bars will slide to the left or right in order to allow cars to go around curves in the track. To couple cars, however, the drawbar must be in the middle of its housing rather than off to its right or left. Otherwise, when the coupler is brought together with the coupler on an adjacent car, there can be damage to the coupler or to the car.

A responsibility of railroad workers is to make sure the drawbar is straight and not misaligned when the cars are being coupled. To straighten the drawbar, a switchman leans against it and uses the weight of his body to move it into position. BN safety rules instruct workers in writing to straighten drawbars. It is the worker's duty to see that coupling appliances are in place and to adjust the drawbars prior to making coupling.

In compliance with these rules Plouffe straightened a drawbar on October 29, 1979 and injured his back. Plouffe reported the accident and this time the railroad inspected the accident scene. Although the railroad found no defect in the drawbar, the absence is irrelevant. "The fact the coupler functioned properly before or after the incident in question is immaterial." McGee v. Burlington Northern, Inc. (1977), 174 Mont. 466, 571 P.2d 784. Once again, the duty of the railroad to insure worker safety is absolute, without regard to negligence or the normal efficiency of the couplers. Title 45, U.S.C., § 2; Affolder v. New York C. & St. L. R. Co. (1950), 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683. Title 45, U.S.C. § 2 holds that it is "unlawful for any . . . common carrier (engaged in interstate commerce by railroad) to haul or permit to be . . . used on its line any car . . . not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of cars." Because the railroad admits that Plouffe went between the cars to straighten the drawbar, as was his obligation, and because the drawbar is part of the coupling device and must be kept in operating order, the railroad violates Title 45, U.S.C. § 2 if the drawbar is so out of line that the car cannot be coupled automatically on impact. Plouffe was entitled to summary judgment on the liability issue for this accident.

The final accident took place on February 10, 1981. Doug Plouffe was a switchman in a three man crew engaged in uncoupling cars. One of the pins that allows the coupler of a car to release was not working during the uncoupling operation. This required Plouffe to walk along with the movement of the train, holding the pin lifter level to make

- 11 -

sure the couplers disengaged. As he was getting ready to give the engineer a stop signal, he stepped in a hole between the railroad ties and the adjacent ballast, lost his footing and sprained his lower back and right knee. Plouffe had not seen the danger because fresh snow had filled the hole.

Plouffe's account of how this accident happened was uncontradicted and is corroborated by the testimony of the engineer who saw the accident and a crew member who actually saw the hole and recommended to BN that it provide fill in that area.

In McGee v. Burlington Northern, Inc. (1977), 174 Mont. 466, 477, 571 P.2d 784 this Court approved the following jury instruction:

> The Safety Appliance Act imposes an absolute duty . . . upon the railroad to provide its cars with coupling devices which operate efficiently at the time of the accident. If you should find from the evidence that plaintiff operated the uncoupling device in the usual accepted and customary manner and the uncoupler failed to immediately respond in an efficient manner, the railroad was in violation of the Safety Appliance Act.

Here, the pin lifter was not working and Plouffe was required to walk along with the train. Based on Title 45, U.S.C. § 2 and the authority cited above, this in itself was a violation of the FSAA. Therefore, we conclude there was sufficient undisputed evidence on which the District Court could base an order granting partial summary judgment. Appellant BN claimed that the action should have been in negligence and not brought under the FSAA because it was negligence (and not a violation of the FSAA) for it to have inadequate fill between the ties. This argument is illogical because it ignores the fact that Plouffe would not have been walking alongside the car (and hence injured) if the pin lifter had been operating.

- 12 -

By granting summary judgment on liability the District Court took the issues from the jury of whether BN's violation of the FSAA caused the accidents. The railroad claims that there was insufficient evidence to establish the cause of Plouffe's accidents because there were no accidents in three of the four incidents. BN speculates that Plouffe could have been injured in ways that did not involve violations of the FSAA. However, we follow the rule that inferences drawn from circumstantial evidence can be as probative as direct evidence. Barich v. Ottenstror (1976), 170 Mont. 38, 550 P.2d 395; Anderson v. Burlington Northern, Inc. (Mont. 1985), 709 P.2d 641, 42 St.Rep. 1738. Furthermore, the party opposing a motion for summary judgment on a record which reveals no issue of material fact must present facts of a substantial nature. Conclusionary or speculative statements are insufficient to raise genuine issues of material fact. Barich, supra; Rule 56, M.R.Civ.P. Here the railroad relied exclusively on speculative statements inconsistent with their earlier admissions. We agree with the District Court's conclusion that the railroad totally failed to set forth specific facts showing that there is a genuine issue for trial. "All (the railroad) does is tell the Court that it would be better to let the matter go to the jury because of its 'allegations or denials of its pleading.' As set forth in Rule 56(e), this is not sufficient."

The railroad is also incorrect in claiming that the District Court took the issue of causation away from the jury. The issue of medical causation, that is whether or not the accidents caused injuries to Plouffe, was properly left to the jury.

The manner in which the accidents occurred and how they aggravated Plouffe's back condition was fully explored. In short, the pertinent issues of causation of injury were left to the jury. The only issues not submitted to the jury were those that were established by uncontradicted evidence.

The second issue raised by the railroad involves what the railroad believes is a post-trial event justifying a new trial. The week after trial, Plouffe went to the trainmaster in Havre and requested he be permitted to go back to work. He presented a note from his chiropractor which said "Doug Plouffe may now return to work." The same chiropractor had testified at trial that it was not medically feasible for Plouffe to return to work because it would aggravate his back condition. The railroad contends this evidence implies that Plouffe was physically able to return to work and that he intended to continue working in spite of his injuries. The railroad also argues that Plouffe committed fraud on the court, arguing that the note supported their position that the injuries were not severe enough to justify an award compensating him for lost earnings to the extent of his work life expectancy.

Contrary to the railroad's arguments, this evidence is not new and it does not automatically imply that fraud has been committed. The District Court, in its order ruling against BN's motion for a new trial, found that the note was similar to many other notes submitted when Plouffe was forced to go to work because he needed the money. It is evident from the record that it was not wise for Plouffe to continue working, because he was only aggravating his back condition. However, it is equally clear that Plouffe had unavoidable financial obligations of family and home that had to be met

in spite of his doctors' and chiropractor's recommendations. After the judgment, Plouffe's financial status made it imperative that he secure income pending appeal. Hence the note to the railroad from Dr. Pardis. When Dr. Pardis felt Plouffe had recovered enough to return to work, he would submit notes similar to the one in issue. The trial changed matters little. Plouffe still needed to work to meet his obligations and Dr. Pardis, consistent with his earlier routine, released Plouffe to return to work after trial. The fact that Plouffe tried to continue to work despite his disabilities is not new. It was the same type of evidence presented at trial. Therefore, the railroad's contention is meritless.

The final issue involves the District Court's denial of Plouffe's motion for an award of prejudgment interest. Plouffe relies heavily on Garcia v. Burlington Northern Railroad Co. (D. Colo. 1984), 597 F.Supp. 1304, a 1984 decision currently under appeal that held that the "legislative history and subsequent judicial application of the FELA demonstrate that granting prejudgment interest . . . would promote the policies underlying the Act." Although prejudgment interest would address legimate concerns, discouraging dilatory pretrial tactics, the law of Montana does not provide such relief. Section 27-1-211, MCA, provides, "Every person who is entitled to recover damages certain or capable of being made certain by calculation and the right to recover which is vested in him upon a particular day is entitled also to recover interest thereon from that day." In short, this statute allows interest only from the date of judgment, as that is the day the damages are capable of being made certain. Callihan v. Burlington Northern, Inc.

(1982), 201 Mont. 35, 654 P.2d 972; Wyant v. Dunn (1962), 140 Mont. 181, 368 P.2d 917.

Therefore we affirm the District Court's grant of Doug Plouffe's motion for partial summary judgment.

_____
_Justice_

We Concur:

_____
_Chief Justice_

_____

_____

_____

_____
_Justices_