**Walter F. LISEK, Plaintiff–Appellant,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant–Appellee.**

No. 93–2785.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 11, 1994.

Decided July 14, 1994.

Rehearing Denied Aug. 24, 1994.

Steven G. Bailey (argued), Eric D. Jackstadt, Callis Law Firm, Granite City, IL, for plaintiff-appellant.

Evan B. Karnes, II (argued), Susan Davis McGarry, Law Offices of Evan B. Karnes II & Associates, Chicago, IL, for defendant-appellee.

Before BAUER, ESCHBACH and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

After being injured while performing his duties as a switchman for Norfolk and Western Railway Company ("N & W"), Walter Lisek sued the company under the Federal Safety Appliance Act ("FSAA"), 45 U.S.C. §§ 2–43a, and the Federal Employers Liability Act ("FELA"), 45 U.S.C. §§ 51–60. Finding that even with all inferences in his favor Lisek had failed to establish a violation of either act, the district court granted N & W's motion for summary judgment. Lisek appeals, and we affirm.

## I. Background

Lisek was employed by N & W as a switchman in its Calumet yard in Chicago.[1]

---

1. This factual summary is based on the parties' statements of uncontested facts, filed in compliance with the Northern District of Illinois' General Rule 12(m) and (n) and found at R. 41 and 47. In accordance with that rule, and consistent with Fed.R.Civ.P. 56(e), all facts contained in the

The switchman's duties include "making-up" trains by linking together otherwise separate cars. That task requires, as a preliminary matter, inspecting the cars' coupling mechanisms to see that they are properly positioned for coupling. Located at either end of each car, the coupling mechanism consists of a drawbar and knuckle that connects with its mate on the adjacent car. The drawbar rests on a pivot, which provides for lateral movement so that cars will not derail while rounding curves. Although coupling occurs "automatically" upon impact, the drawbars must be aligned and at least one of the knuckles must be open in order for the cars to connect. Thus, prior to coupling, the switchman must check the position of the couplers, aligning drawbars and opening knuckles when necessary. Because there is no automated means of centering misaligned drawbars,[2] this task is commonly performed manually by a switchman.

On August 5, 1989, Lisek walked between two adjacent tracks in the Calumet yard, numbers 18 and 19, simultaneously checking the cars on either side in preparation for coupling.[3] He came across a misaligned drawbar on Track 19 and went to straighten it. Preparing to move "a couple thousand pounds worth of steel ... an inch at a time"—a task that is accomplished with "a pushing, lifting motion," and "take[s] all the force of your body"—he gripped the drawbar from below with his hands near his waist. (R. 41, Ex. C at 178–79.) He placed his left foot on a tie inside the rail, and his right foot outside of the rail. (*Id.* at 176–77.) When he began to push the drawbar, however, it moved with unexpected ease. Lisek lost his grip and his feet slipped out from under him. He hit his left knee on the ground, and landed in a prone position. (*Id.* at 179–81.) At that point he noticed a "wet foreign substance" on the tie, which he believed to be grease. (*Id.* at 182–83.) In retrospect, he was unsure whether the fall was caused by the unexpected acquiescence of the drawbar, the grease on the tie, or the two factors in combination. (*Id.* at 179–81, 189.) In any event, the fall caused permanent injury to Lisek's knee and spawned this litigation.

## II. FSAA Claim

### A. The Law

■ Although the FSAA does not itself create a private right of action, employees who allege that they have been injured as a result of FSAA violations may sue under the FELA, 45 U.S.C. § 51. *See Crane v. Cedar Rapids & Iowa City Ry. Co.,* 395 U.S. 164, 166, 89 S.Ct. 1706, 1708, 23 L.Ed.2d 176 (1969). Because the railroad's duty under

movant's 12(m) statement and not controverted in the opponent's 12(n) statement are deemed admitted. The opponent must set out any additional facts that it believes create a factual issue in its 12(n) statement as well. *See Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir.1994) ("district courts are not obliged ... to scour the record looking for factual disputes") & 923 (12(n) statements are "roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own."). Here, in addition to his 12(n) statement and his memorandum of law, Lisek filed an unusual document entitled "Plaintiff's Response to Defendant's Motion for Summary Judgment on Counts I and II" ("Response"). Comprised of 15 numbered paragraphs, this document contains various factual and legal assertions and cites to affidavits and exhibits as well as to case law. Because this document in any event creates no factual dispute, we need not decide whether it properly should be considered as supplementary to Lisek's 12(n) statement, although we certainly would not encourage such filings in future cases.

Because we are reviewing N & W's summary judgment motion, we have resolved all factual disputes and made all factual inferences in Lisek's favor. Lisek's deposition, included in R. 41 as Exhibit C, is also cited.

**2.** Lisek asserts that there is experimental equipment available for this purpose, but does not contend that it is in common use. (*See* R. 47 ¶ 41.) Other courts have reached the same conclusion. *See, e.g., United Transp. Union v. Lewis,* 711 F.2d 233, 235 n. 5 (D.C.Cir.1983) ("After 90 years automatic *realigning* devices, as opposed to automatic *coupling* devices, are still in the experimental stage and have been installed on less than one percent of railroad cars." (emphasis in original)); *Metcalfe v. Atchison, Topeka and Santa Fe Ry. Co.,* 491 F.2d 892, 896 n. 2 (10th Cir.1974).

**3.** Although he apparently had been assigned only to check Track 18, Lisek simultaneously checked Track 19 on his own initiative in order to save time. (R. 41, Ex. C at 145.)

the FSAA is absolute, the employee must prove only that the statute was violated, and no showing of negligence is required. *Id.; Affolder v. New York, C. & St. L.R. Co.*, 339 U.S. 96, 99, 70 S.Ct. 509, 510, 94 L.Ed. 683 (1950). In other words, "a failure of equipment to perform as required by the [FSAA] is in itself an actionable wrong, in no way dependent upon negligence and for the proximate results of which there is liability—a liability that cannot be escaped by proof of care or diligence." *O'Donnell v. Elgin, J. & E. Ry. Co.*, 338 U.S. 384, 390, 70 S.Ct. 200, 204, 94 L.Ed. 187 (1949); *see also Affolder*, 339 U.S. at 99, 70 S.Ct. at 510.[4]

■ Lisek's claim rests on an alleged violation of FSAA section 2, which provides:

> It shall be unlawful for any railroad to haul or permit to be hauled or used on its line any car not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.

45 U.S.C. § 2. First enacted in 1893, section 2 was meant to address the safety risks associated with manual coupling, which had required workers to stand between cars as they moved together, sometimes at speeds of up to 12 miles per hour. *See United Transp. Union v. Lewis*, 711 F.2d 233, 247 n. 34 (D.C.Cir.1983).[5] The Supreme Court has held that the statutory phrase "without the necessity of men going between the ends of the cars" applies to coupling as well as to uncoupling. *Johnson v. S. Pacific Co.*, 196 U.S. 1, 18–19, 25 S.Ct. 158, 161–62, 49 L.Ed. 363 (1904). To comply with the statute, then, equipment must enable workers to accomplish both tasks without going between cars. Lisek claims that N & W violated section 2 in that workers needed to go between cars to manually align drawbars before automatic coupling could occur.

Although the Supreme Court has not directly addressed the question of whether the need for manual intercar drawbar alignment violates section 2, it shed light on the issue in *Affolder v. New York, C. & St. L.R. Co.*, 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683 (1950). In *Affolder*, a worker had been injured chasing after a runaway chain of cars, which had broken away after two cars had failed to couple on impact. Focusing on the question of whether the plaintiff could meet his burden by showing a failure to couple or whether he must also establish that the coupler was defective, the Court held that the former was sufficient. Thus, "the plaintiff did not have to show a 'bad' condition of the coupler" and "neither evidence of negligence nor of diligence and care was to be considered on the question of this liability." *Id.* at 99, 70 S.Ct. at 511; *see also Maldonado v. Missouri Pac. Ry. Co.*, 798 F.2d 764, 767 (5th Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762 (1987). But the Court added this caveat:

> Of course this assumes that the coupler was placed in a position to operate on impact. Thus, if "the failure of these two cars to couple on impact was because the coupler on the Pennsylvania car had not been properly opened", the railroad had a good defense.

339 U.S. at 99, 70 S.Ct. at 511. Reiterating that principle in his dissent, Justice Jackson wrote:

> Before a failure to couple establishes a defective coupler, it must be found that it was properly set so that it could couple. If it was not adjusted as such automatic couplers must be, of course the failure is not that of the device.

*Id.* at 101, 70 S.Ct. at 512 (Jackson, J., dissenting).[6]

Although several circuit and state courts have considered whether the *Affolder* excep-

---

**4.** Although both *Affolder*, 339 U.S. at 99, 70 S.Ct. at 510 and *O'Donnell*, 338 U.S. at 390, 70 S.Ct. at 204 speak in terms of proximate causation, *Crane* explained that the employee "is not required to prove common-law proximate causation but only that his injury resulted 'in whole or part' from the railroad's violation of the Act." 395 U.S. at 166, 89 S.Ct. at 1708 (quoting 45 U.S.C. § 51).

**5.** For the history of section 2 see *Lewis*, 711 F.2d at 245–248. The section was most recently amended on June 22, 1988.

**6.** Justice Jackson disagreed that the jury instructions at issue were proper, but agreed with the majority's characterization of the law.

tion to absolute liability applies to misaligned drawbars as well as to unopened knuckles, they have not reached consensus. Finding the two conditions distinguishable (without explaining why), the Tenth Circuit held in *Kansas City S. Ry. Co. v. Cagle*, 229 F.2d 12, 14–15 (10th Cir.1955), *cert. denied*, 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. 1443 (1956), that a railroad was liable when cars failed to couple due to a misaligned drawbar, notwithstanding *Affolder's* holding regarding unopened knuckles. The court reaffirmed its position in *Metcalfe v. Atchison, Topeka and Santa Fe Ry. Co.*, 491 F.2d 892, 896–97 (10th Cir.1974), although it did so without discussing *Affolder*.

The Sixth Circuit also found that misaligned drawbars are distinguishable from closed knuckles in *Clark v. Kentucky & Indiana Terminal R.R.*, 728 F.2d 307, 312 (6th Cir.1984). It reached that conclusion for two reasons, both compelling. First, the court found as a factual matter that a drawbar could not be so far out of alignment as to impede coupling unless it was defective:

> A coupler typically has a lateral play of one to one and one-half inches on either side that permits movement of coupled cars around curves. But a coupler's lateral motion may be increased by wear. "[T]he customary play of an inch or a little more does not interfere with ... coupling upon impact." But "[i]f the couplers are out of alignment beyond the normal play, the coupling will not make automatically even though both knuckles are opened." In contrast, a coupler knuckle is by design either open or closed. Unlike misalignment, the knuckle's position is not attributable to aging equipment.

*Id.* at 312–313 (citations omitted). Second, the court found that a closed knuckle differed from a misaligned drawbar in that the former could be corrected without the necessity of workers going between cars, while the latter could not:

> As importantly, should both couplers be found in the closed position before an attempted coupling, a worker can open a knuckle by operation of the lift lever on the side of the railroad car. In order to correct a coupler so out-of-line that a suc-

cessful coupling is impossible a railroad worker is required to step between the cars and make the adjustment.

*Id.* at 313. Thus, *Clark* reasoned, the manual opening of knuckles does not contravene section 2, while the manual alignment of drawbars, which requires workers to go between cars, violates the statutory requirement.

The state courts have also overwhelmingly held that a failure to couple due to drawbar misalignment constitutes a violation of the Act. *See, e.g., Finley v. S. Pac. Co.*, 179 Cal.App.2d 424, 3 Cal.Rptr. 895, 900–01 (1960); *Pry v. Alton & S. Ry.*, 233 Ill.App.3d 197, 174 Ill.Dec. 287, 299, 303, 598 N.E.2d 484, 496, 500 (1992); *Buskirk v. Burlington N., Inc.*, 103 Ill.App.3d 414, 59 Ill.Dec. 125, 127, 431 N.E.2d 410, 412, *cert. denied*, 459 U.S. 910, 103 S.Ct. 217, 74 L.Ed.2d 173 (1982); *Schaaf v. Chesapeake & Ohio Ry. Co.*, 113 Mich.App. 544, 317 N.W.2d 679, 680–81 (1982), *cert. denied*, 464 U.S. 848, 104 S.Ct. 153, 78 L.Ed.2d 142 (1983); *Hallada v. Great N. Ry.*, 244 Minn. 81, 69 N.W.2d 673, 680–81, *cert. denied*, 350 U.S. 874, 76 S.Ct. 119, 100 L.Ed. 773 (1955), *overruled in part on other grounds, Busch v. Busch Constr., Inc.*, 262 N.W.2d 377, 396–97 (Minn.1977); *White v. Atchison, Topeka & Santa Fe Ry.*, 244 S.W.2d 26, 29–30 (Mo.1951), *cert. denied*, 343 U.S. 915, 72 S.Ct. 648, 96 L.Ed. 1330 (1952); *Plouffe v. Burlington N., Inc.*, 224 Mont. 467, 730 P.2d 1148, 1154–55 (1986); *Eschberger v. Consol. Rail Corp.*, 174 A.D.2d 983, 572 N.Y.S.2d 539, 540 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992); *McGowan v. Denver & R.G.W.R. Co.*, 121 Utah 587, 244 P.2d 628, 634 (1952), *cert. denied*, 344 U.S. 918, 73 S.Ct. 346, 97 L.Ed. 707 (1953).

But this view has not been unanimously adopted by the federal circuits. Although not directly on point, the decision of the District of Columbia Circuit in *United Transp. Union v. Lewis*, 711 F.2d 233 (D.C.Cir.1983) has been influential with courts that have adopted the contrary position. In *Lewis*, the court discussed whether the use of a metal hook device during the uncoupling process violates section 2 because its use requires a switchman to insert part of

his body between cars. Based on an extensive review of the statute and its legislative history, the court concluded that the statute was meant to mandate the use of certain equipment, but not to regulate operating procedures. Although the statute requires the use of automatic couplers, it does not make unlawful any procedure that would involve going between cars.[7] *Id.* at 251. In other words, "the final phrase of section 2 is not an 'independent requirement' but is instead merely 'descriptive of the equipment required.'" *Id.* at 249 (quoting *United States v. Illinois Cent. R.R.*, 170 F. 542, 550 (6th Cir.1909)).[8]

Relying on the *Lewis* equipment/procedure distinction, the Third Circuit held that a railroad could raise the defense of drawbar misalignment in *Reed v. Philadelphia, Bethlehem & New England R.R. Co.*, 939 F.2d 128, 131–32 (3d Cir.1991), *cert. denied,* — U.S. ——, 113 S.Ct. 1584, 123 L.Ed.2d 151 (1993). The court explained:

> We think the rationale of *Affolder,* which allows a defense of closed knuckles, applies equally to a situation where non-defective equipment is misaligned. In both instances, the causative factor which prevents the coupling may result from jarring or vibration of the car while moving, or from human error in failing to open the knuckle or align the drawbar. In these situations, the failure to couple might not be caused by defective equipment and consequently is not a violation of the Safety Appliance Act.

*Id.* at 132. At the same time, the court made clear that when raising this defense, the railroad bears the burden of showing that the misalignment was not caused by an equipment failure. Indeed, the Court approved a jury instruction that required the railroad "to establish a separate cause for failure to couple, other than equipment failure." *Id.*

The same requirement was adopted by the Fifth Circuit in *Maldonado v. Missouri Pacific Ry. Co.*, 798 F.2d 764 (5th Cir.1986). Without deciding whether or not a misaligned drawbar could ever be a defense to section 2 liability,[9] the court held that, if it could, the railroad would have to produce evidence showing that the misalignment was not due to a failure or defect in the equipment:

> Evidence that the drawbars were misaligned so as to prevent coupling places a burden on the railroad to produce evidence tending to show a separate cause for the failure to couple. This is so because a failure to couple due to a deficiency in the equipment, such as a drawbar with more lateral play than is appropriate for normal operation, clearly amounts to a violation of the FSAA.

*Id.* at 768. Because the railroad had failed to advance such evidence, the court found that the district court had not erred when it instructed the jury that operating a car with its drawbar sufficiently out of line to prevent coupling amounted to an FSAA violation. *Id.* at 767–69.

Finally, although not relying on the *Affolder* paradigm or discussing the railroad's burden of proof, the Fourth Circuit recently agreed with *Reed* that "a simple misalignment" of non-defective couplers does not violate the FSAA. *Goedel v. Norfolk & W. Ry. Co.*, 13 F.3d 807, 812 (4th Cir.1994).[10]

---

**7.** Indeed, the court noted, the FSAA requires the use of air brakes, which are manually connected by workers between cars after the couplers have engaged. The court also noted that even the use of cut-levers, the ends of which do not extend beyond the side of the car, requires switchmen to place their hands between cars. *Id.* at 245 & nn. 31–33.

**8.** *Lewis* did advert to the issue of drawbar misalignment and section 2 in two footnotes that we consider below. *See infra* nn. 14–15 and accompanying text.

**9.** Although it found ultimate resolution of the issue unnecessary in light of the railroad's failure to meet its burden, the court approved the *Lewis* equipment/procedure distinction and noted that it "suggests that drawbar misalignment should be a defense to failure to couple in instances where the misalignment which causes the non-coupling does not reflect defective or failed equipment." 798 F.2d at 768.

**10.** The FSAA issue was only indirectly relevant in *Goedel.* Because Goedel was not an employee of the railroad, his claim was based on state tort law rather than on FELA. Whether the FSAA had been violated was relevant because under West Virginia law a statutory violation would amount to prima facie evidence of negligence. *See id.* at 810. The court was therefore apparently able to avoid the complexities that have emerged from the other cases.

## B. Lisek's Claim

Lisek's claim differs from that in many of these cases because his accident did not follow an unsuccessful attempt at coupling.[11] Instead, Lisek noticed the misaligned drawbar, determined that it would prevent coupling, and went to straighten it in advance of the attempt. The district court found that a failed attempt at coupling was "an integral part of the proof of equipment failure under section 2," and that Lisek's failure to establish a pre-accident impact was fatal to his claim. It therefore granted N & W's summary judgment motion.

■ We agree with the district court that the absence of a failed coupling attempt is significant because it is the failure to couple that triggers the railroad's absolute liability under section 2. See, e.g., Affolder, 339 U.S. at 98, 70 S.Ct. at 510 ("the duty under the Acts is not based on the negligence of the carrier but is an absolute one requiring performance 'on the occasion in question.' ") & 99 ("the plaintiff did not have to show a 'bad' condition of the coupler; she was entitled to a peremptory instruction that to equip a car with a coupler which failed to perform properly 'in the switching operation was a violation of the Act....' "). In other words, the Act requires automatic coupling equipment and the failure to couple creates the nearly irrebuttable presumption that the Act has been violated.

Whether the failure to couple is a necessary prerequisite to absolute liability in a misalignment case, however, depends on whether the Affolder defense is extended to include misalignment. If the Affolder defense is unavailable in misalignment cases, then the railroad is liable for all injuries resulting from misalignment, and the requirement of a pre-injury coupling attempt would be senseless. In other words, if any misalignment could trigger liability, then requiring that workers attempt coupling even though they know it will fail due to misalignment [12] would only encourage inefficient procedures on railyards and increase the risks to employee safety. This may explain why those courts that have found all misalignments to trigger liability have not required a pre-injury coupling attempt. See, e.g., Clark, 728 F.2d at 312; Chicago, St. P., M. and O. Ry. Co. v. Muldowney, 130 F.2d 971, 975–76 (8th Cir.1942), cert. denied, 317 U.S. 700, 63 S.Ct. 526, 87 L.Ed. 560 (1943).

If, on the other hand, the Affolder defense applies to misaligned drawbars, then a pre-injury coupling attempt is a necessary prerequisite to absolute railroad liability. If the

---

11. Lisek does not dispute the fact that his accident occurred prior to coupling the cars, which presumably would have ensued if not for Lisek's accident. His 12(n) statement does not assert that there was a pre-accident coupling attempt or otherwise controvert N & W's assertion that there had not been. That alone is of course enough for us to deem the fact admitted. (See supra n. 1.) Lisek does attempt to cloud the issue, however, via this statement in his "Response":

  [T]he "bowl" design of the Calumet Yards, wherein the switches leading into track 19 are higher in elevation than the track between them, leads to a reasonable inference that the car in question would have rolled toward and contacted the first car in track 19, and they should have coupled on impact were it not for the failure of the automatic couplers to operate as mandated by Congress.

(R. 44 ¶ 5.) We need not consider what weight to give this "fact" (included as it is in Lisek's "Response," but not in his 12(n) statement) because the record is completely devoid of evidence suggesting that this is what happened on August 5, 1989. Indeed, in the portion of Lisek's deposition that is cited to support this assertion, he

affirmatively denied knowing whether the cars on track 19 had been switched in a manner that would have resulted in coupling on the morning of August 5. (R. 42 Ex. C at 205–06.) The other deposition portions cited to support this proposition do not in any way pertain to it. Finally, Lisek's affidavit (R. 46, see infra n. 20), the final document cited in support of this proposition, contains only a similar general and conclusory statement. In addition, Lisek has failed on appeal to contest the district court's factual finding that no coupling attempt had preceded the accident, even though it underlay the district court's sole reason for granting N & W's motion. That failure not only requires us to accept the district court's finding as a technical matter (based on the doctrine of waiver), but also persuades us that the court's factual finding was correct.

12. Lisek, for example, testified that he could tell by looking whether a drawbar was misaligned to such an extent that coupling would not be possible. Because that testimony seems reasonable in light of his experience, a jury could reasonably have determined that the drawbar was in fact so far out of alignment that coupling would not have been possible.

failure to align the drawbars prior to coupling constitutes a defense to liability under the Act, then the performance of that procedure obviously cannot give rise to the presumption that the railroad has violated the Act. Instead, only misalignment occurring after a coupling attempt (and consequently after pre-coupling alignment) could give rise to liability, as only such misalignment would support the inference that the equipment was not functioning properly.[13] Absolute liability in a misalignment case, then, would only be triggered by a prior unsuccessful coupling attempt.

Because resolution of our case therefore depends on whether the *Affolder* defense should be extended to misaligned drawbars, we must, however reluctantly, enter that debate. In so doing, we note that the courts' differing views on this question seem, understandably, to rest largely on their differing answers to the question of whether pre-coupling drawbar misalignment is indicative of an equipment failure or whether it happens as part of the normal operation of nondefective, FSAA-compliant equipment. In light of its conclusion that misalignment in all instances reflects an equipment failure, for example, *Clark's* holding that drawbar misalignment does not come within the *Affolder* exception to absolute liability makes sense. If misalignment reflects a defect, then it is unlike a closed knuckle (which does not), and the *Affolder* exception, meant to preclude railroad liability for compliant equipment, would not be applicable. *Reed's* finding that misalignment does not necessarily reflect a defect, by contrast, supports its conclusion that a misaligned drawbar is indistinguishable from a closed knuckle:

> In both instances, the causative factor which prevents the coupling may result from jarring or vibration of the car while moving, or from human error in failing to open the knuckle or align the drawbar. In these situations, the failure to couple might not be caused by defective equipment and consequently is not a violation of the Safety Appliance Act.

939 F.2d at 132. Thus, under *Reed,* the railroad is not liable (even after a failed coupling attempt) if it can show that the failure resulted from the lack of pre-coupling alignment.[14]

■ Not only do we view the issue of whether or not nondefective equipment can become misaligned as underlying the courts' divergent holdings on this issue, we are convinced that it provides the only reasonable basis for resolving this question. The purpose of section 2 is to require the use of automatic coupling equipment, and a railroad is liable only for violations of the section. It cannot be liable when it utilizes equipment that complies with the statutory mandate and is not defective. As *Lewis* makes clear, "[t]he predicate for liability under section 2 is the failure to provide equipment that functions as the statute commands." 711 F.2d at 251. If it is normal for nondefective automatic couplers to become misaligned as a part of ordinary railyard operations, then it is simply not reasonable to hold that such misalignment amounts to a violation of the

---

13. Of course, an injured employee could always establish an equipment failure outside the constraints of this framework, but that would amount to an ordinary negligence claim, actionable directly under FELA § 51. As discussed below, Lisek has failed to make out such a claim here.

14. Although the *Lewis* court was not actually faced with the issue of drawbar misalignment and section 2, it did note that pre-coupling misalignment was normal and suggested, albeit obliquely, that such misalignment would not therefore give rise to liability:

> That the knuckle on the coupler closes or that the drawbar goes out of alignment with the next car due to vibration or jarring does not indicate that the coupler is "defective." To be effective the coupling apparatus must permit limited lateral movement of the drawbar in order to allow the cars, when coupled together, to pass around curves without derailment and to allow coupling on a curve. Occasionally, drawbars move so far out of alignment as to preclude automatic coupling. It then becomes necessary to adjust the drawbar or the coupling knuckle, and this may require going between the cars. *Metcalfe v. Atchison, Topeka & Santa Fe Ry.,* 491 F.2d 892, 896 (10th Cir. 1974). After 90 years automatic *realigning* devices, as opposed to automatic *coupling* devices, are still in the experimental stage and have been installed on less than one percent of railroad cars. *Id.* at 896 n. 2.

711 F.2d at 235 n. 5 (emphasis in original); *see also id.* at 251 n. 39.

Act. As both the uncontested facts of this case and the findings of other courts indicate, no automatic means for aligning drawbars is commonly available at this time. *See supra* n. 2 and accompanying text. We agree with the District of Columbia Circuit that the Congress of 1893 certainly could not have meant to require equipment that is still unavailable 100 years later. 711 F.2d at 251 n. 39. As that court explained:

> We shrink from accepting a reading of section 2 that would be tantamount to a pronouncement that 99% of all railroad cars violate section 2—and have done so for the entire 90 years the Act has been in effect.

*Id.*

In sum, then, whether a prior attempt at coupling is required to trigger the railroad's absolute liability in a misalignment case depends on whether the *Affolder* defense extends to misalignment, and that, in our view, depends on whether nondefective equipment can become misaligned as part of normal railyard operations.[15] Having come that far, our task becomes quite simple, as it is uncontested for purposes of this case that nondefective coupling mechanisms can, through the normal course of railyard operations, become misaligned to an extent that they will not couple without preliminary realignment. *Clark's* conclusion to the contrary was based on its finding that the normal play of a drawbar is one to one and one-half inches in either direction, which is not enough to preclude automatic coupling. 728 F.2d at 312–13. According to the uncontested facts in our case, however, the car on which Lisek was injured was a "piggyback car," a flat car that is used to provide "trailer on flat car" (TOFC) and "container on flat car" (COFC) service. (R. 41 ¶¶ 10–11, 19–21.) Such cars are longer than standard boxcars and therefore require drawbars having one and one-half *feet* of lateral play. (*Id.* ¶ 18.) Lisek has not disputed the fact that such drawbars can become misaligned to the point of impeding coupling during the normal course of railyard operations and that such misalignment does not reflect any defect in the drawbars. (*Id.* ¶ 22, 33, 35–38.)

According to the undisputed facts, then, the normal operation of nondefective automatic coupling equipment (i.e. equipment that complies with section 2) occasionally requires manual intercar drawbar alignment prior to coupling in order to function. That being so, the mere existence of a misaligned drawbar cannot trigger the railroad's absolute liability in the same way that a failure to couple would. In light of the absence of a failed coupling attempt, we must affirm the district court's dismissal of Lisek's FSAA claim.

### III. FELA Claim

45 U.S.C. § 51 provides that railroads operating in interstate commerce:

> shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

■■ The FELA is meant to provide a broad remedial framework for railroad workers and, in light of that purpose, is to be liberally construed in their favor. *Atchison, Topeka & Santa Fe Ry. v. Buell,* 480 U.S. 557, 562, 107 S.Ct. 1410, 1414, 94 L.Ed.2d 563

---

15. Although neither *Reed* nor *Lewis* addressed the question of whether a prior coupling attempt is necessary to trigger the railroad's absolute liability in a misalignment case, we believe that, because it flows so naturally from the finding that pre-coupling misalignment is normal and that the *Affolder* defense applies to misalignment, both cases assumed this to be true. The above-quoted portion of *Reed,* for example, assumes that coupling will have already been attempted in a misalignment case ("the causative factor *which prevents the coupling* may result from jarring or vibration of the car while moving, or *from human error in failing to ... align the drawbar* [prior to coupling].") 939 F.2d at 132 (emphasis added). Even more explicit, *Lewis* qualified its finding that misalignment was normal by stating, "[a]t the same time, however, *actual failure* to couple automatically because of a misaligned drawbar ... is sufficient to establish liability under section 2." 711 F.2d at 251 n. 39 (emphasis in original). The court thus seems to assume that the failed coupling attempt distinguishes actionable from nonactionable misalignment.

(1987); *Kulavic v. Chicago & Illinois Midland Ry. Co.,* 1 F.3d 507, 512 (7th Cir.1993). Plaintiffs' burden in a FELA action is therefore significantly lighter than it would be in an ordinary negligence case. In a FELA action, the railroad is liable if "the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury...." *Harbin v. Burlington N. R.R. Co.,* 921 F.2d 129, 131 (7th Cir.1990) (quoting *Rogers v. Missouri Pac. R.R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957)); *see also Deutsch v. Burlington Northern R.R. Co.,* 983 F.2d 741, 743 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993).

■ As the Supreme Court made clear in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–55, 106 S.Ct. 2505, 2512–13, 91 L.Ed.2d 202 (1986), this evidentiary standard must inform our review on summary judgment. *See also, Harbin,* 921 F.2d at 130–31. Specifically, the lightened burden of proof means a correspondingly easier task for a plaintiff defending a summary judgment motion; because his burden at trial is so low, a FELA plaintiff can survive a motion for summary judgment "when there is even slight evidence of negligence." *Harbin,* 921 F.2d at 131 (citing *Wilson v. Chicago, Milw., St. P., & Pac. R.R. Co.,* 841 F.2d 1347, 1353 (7th Cir.), *cert. dismissed,* 487 U.S. 1244, 109 S.Ct. 1, 101 L.Ed.2d 953 (1988); *Lancaster v. Norfolk & W. Ry. Co.,* 773 F.2d 807, 820 (7th Cir.1985), *cert. denied,* 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987)); *see also Deutsch,* 983 F.2d at 743.

■ Still, a FELA plaintiff is not impervious to summary judgment. If the plaintiff presents no evidence whatsoever to support the inference of negligence, the railroad's summary judgment motion is properly granted. *See Deutsch,* 983 F.2d at 744. Nor are the Federal Rules of Civil Procedure or the

Northern District of Illinois' Local Rules governing summary judgment suspended in a FELA case merely because of the plaintiff's lightened burden as to negligence. Under those rules, summary judgment must be granted if "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). And, the party opposing summary judgment:

> may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). In the Northern District of Illinois, Local Rule 12(n) requires that response to be filed in specified form:[16]

> Each party opposing a Rule 56 motion shall serve and file ... a concise response to the movant's statement [of material facts as to which the moving party contends there is no genuine issue]. That response shall contain (1) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and (2) a statement, consisting of short numbered paragraphs, of any additional facts which require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.

■ Apparently more concerned with his FSAA claim, Lisek's response to N & W's summary judgment motion contains scant reference to his FELA claim.[17] Most signifi-

---

16. Rule 12(n) was slightly modified by an amendment that became effective on April 4, 1994. We quote here the pre-amendment rule, effective since June 4, 1990, as that rule was in effect when the district court entered its order granting summary judgment and during the period when all materials relevant to that order were filed.

17. In his appellate brief, Lisek correctly points out that the last sentence of N & W's summary judgment motion—the sentence containing its prayer for relief—refers only to Count II of Lisek's complaint (which contained his FSAA claim) and fails to mention Count I (containing his FELA claim). (*See* R. 40.) But that apparent typographical error certainly did not obscure the

cant, his 12(n) statement contains no factual assertions to support the inference that N & W was in some way negligent or that its negligence somehow caused Lisek's accident. (*See* R. 47.) Ordinarily, that flaw alone would suffice to support the grant of summary judgment in favor of N & W on Lisek's FELA claim. *See generally, Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 922–24 (7th Cir.1994). As already noted, however, Lisek filed a document entitled "Plaintiff's Response to Defendant's Motion for Summary Judgment on Counts I and II," which contains various factual assertions, in addition to his 12(n) statement. Regarding N & W's purported negligence, the "Response" provides: [18]

11. Plaintiff has proved at least one negligent act or omission on the part of the railroad which may have caused, in whole or in part, plaintiff's injury: if the drawbar was slued due to an employee of defendant holding the "pin" up while the car was on a curve, the employee should not have done this because the drawbar may then become misaligned.

12. There are sufficient facts for a jury to conclude that the failure to provide a tool for the purposes of aligning a drawbar was negligence on the part of the railroad which contributed in whole or in part to plaintiff's injury.

13. The Defendant's litany of "innocent" reasons for drawbars to become slued provide sufficient evidence of negligence on the part of defendant.

We need not decide whether this document suffices to meet Lisek's obligations under Rule 12(n), as it in any event creates no factual issue as to N & W's negligence. In support of paragraph 11, Lisek cites the deposition of Steven Csepiga, a switchman with 23 years of experience who works at the Calumet Yard. (R. 42 Ex. E at 7.) In the cited portion, Csepiga testified that the pin should be lifted on straight track, because lifting it on a curve will cause the drawbar to become misaligned. (*Id.* at 65.) The cited testimony, however, sheds no light on whether or not such an error was responsible for the misalignment that resulted in Lisek's injury. The general assertion that lifting a pin while a car is on a curve would be negligent does not shed any light on the issue of negligence on the occasion in question. Lisek has not offered any evidence suggesting that the car was uncoupled on a curve prior to his accident.

In support of paragraph 12, Lisek cites the deposition of Jake Rogers, a switchman who was on Lisek's crew on the day of the accident. (R. 42 Ex. H at 6–9.) In the cited portion of that deposition, Rogers testified that sometimes, if a drawbar could not be moved by hand, a bar would be required to do so, and that in such a case "[t]he yardmaster ... calls the car department and they come out and move it." (*Id.* at 20–21.) It is unclear how that fact is at all relevant to the issue of negligence. In any event, this problem clearly was not involved in Lisek's accident, as, if anything, he was thrown off by the ease with which the drawbar moved.

Finally, Lisek's conclusory reference in paragraph 13 to N & W's discussion of factors that may cause drawbar misalignment (the precise referent of which is unclear) also fails to raise a factual question. The para-

target of N & W's motion. Every other filing connected with that motion—including the notice of filing, the notice of motion, the proof of service, the motion itself, the statement of material facts, and the memorandum of law in support of the motion (which devoted nearly 5 pages to the FELA claim)—made clear that the motion was aimed at both counts. Indeed, Lisek does not appear to have been confused by the error, as his responsive pleading was entitled "Plaintiff's Response to Defendant's Motion for Summary Judgment on Counts I and II," and despite the brevity of his defense of Count II, Lisek did address it in that document. The district court granted the motion as to both counts, and Lisek did not file a subsequent motion under Fed.

R.Civ.P. 59(e) to alter or amend the judgment. We are therefore confident that the parties and the court all were clear that N & W's motion was aimed at both counts.

18. This document contained Lisek's only attempt to flesh out his FELA claim. His complaint asserted only that N & W had been negligent in failing to provide "safe and suitable tools and equipment to perform the task assigned; ... a reasonably safe place to work; [and] ... reasonably safe methods of work." (R. 1, Count 1 ¶ 6.) His memorandum of law in response to N & W's summary judgment motion focused solely on his FSAA claim.

graph does not specify any particular factor and is unsupported by any factual assertions suggesting that any of the factors might involve negligence.

 Because Lisek has therefore failed to offer even a "scintilla" of evidence suggesting that his injury may have resulted from N & W's negligence,[19] the district court was correct to enter summary judgment in favor of N & W on his FELA claim.[20]

### IV. Conclusion

The district court's entry of summary judgment on both Lisek's FSAA claim and his FELA claim was proper. The judgment of the district court is therefore AFFIRMED.

19. Lisek has attempted to expand on his negligence theory on appeal. He argues for the first time, for example, that the grease he saw on the tie after his fall may have involved negligence and may have been at least partially responsible for the fall. Any facts or argument not offered to the district court when it decided the motion, however, are of course waived. *In re Weber*, 25 F.3d 413, 415–16 (7th Cir.1994).

20. In his final argument on appeal, Lisek challenges the district court's decision to strike an affidavit of Lisek that was filed along with his summary judgment materials. (*See* R. 46.) Because nothing in that affidavit would have changed either the district court's or our own analysis, however, we need not consider the propriety of the court's decision to strike it.